Richmond.

## NORFOLK HOSIERY AND UNDERWEAR MILLS V. AETNA HOSIERY CO.

1. ASSUMPSIT—*Pleas—Non-Assumpsit—Recoupment—Section 3264, Code of 1904.*—In an action of assumpsit brought by the seller of goods against the buyer for failure to accept and pay for the goods ordered, defendant pleaded non-assumpsit, and a special plea of recoupment under section 3299, Code of 1904, to recover damages of plaintiff for failure to deliver the goods to the defendant. It was insisted on behalf of plaintiff that when the defendant filed its special plea it forever waived its right to defend on the ground that it had rescinded the contract because of the failure of the plaintiff to begin deliveries at the time agreed upon.

   *Held:* That this position was not tenable. The continued existence of the contract was put in issue by the plea of *non-assumpsit,* and while there could be no recoupment if the contract did not exist, and to this extent the two pleas are inconsistent, this is not a valid objection, for the defendant may plead as many several matters of law or fact as he deems necessary. Section 3264, Code of 1904. Nothing is more common in practice than contradictory pleas. In the case at bar, if the defendant did not seek any recovery over and above the plaintiff's claim, there was no necessity for the special plea as the defense set up by it might have been shown under the general issue of non-assumpsit.

2. PLEADING—*Inconsistent Pleas.*—Inconsistent pleas are allowable, and in trying one, the court cannot look to the existence of the other, hence each branch of the pleading is looked on as totally separate and distinct from every other, and the defenses under one cannot be straightened or curtailed by the existence of the other. Were it otherwise, the liberty of pleading several, and even contradictory, pleas would be defeated.

3. APPEAL AND ERROR—*Harmless Error—Instructions.*—In the instant case it is not assignable as error that some of the instructions given by the trial court were probably more favorable to the defendants than they should have been. Not by the defendants, because they were favorable to them and asked by them, nor by the plaintiff because it was not injured by them, as the verdict was in its favor.

4. SALES—*Time of Delivery—Waiver of Breach.*—Where time is of the essence of a contract of sale, there can be no recovery upon the contract in case of failure to perform within the time stipulated. But there is no reason why one party who had a right to rescind because of breach by the other may not waive that right and hold the other party to performance, and an instruction upon the buyer's right to rescind on this ground, wholly ignoring evidence tending to show a waiver of the provision in the contract in regard to the time of delivery, is erroneous.

5. INSTRUCTIONS—*Partial View of the Evidence—Ignoring Evidence.*—Calling the special attention of the jury to a part only of the evidence and the particular fact or facts it may tend to prove, and ignoring the residue of the evidence and the facts it may tend to prove, gives undue prominence to such recited evidence, and disposes the jury to regard it and the fact it tends to prove as the particular evidence and the fact to be relied on in determining the issue before them, and thus misleads them.

6. INSTRUCTIONS—*Partial View of the Evidence—Ignoring Evidence.*—Instructions in writing are carried by the jury to their room when they retire to consider of the verdict and, if they contain a rehearsal of a part only of the evidence, their tendency is to impress unduly on the jury such part of the evidence, to the disadvantage of the other evidence in the case, which may be equally or more important in determining the issue, although it rests only in the memory of the jury.

7. SALES—*Waiver of Right to Rescind for Breach of Contract—Effect.*—Where a buyer who has the right to rescind the contract of sale upon the failure of the seller to deliver the subject matter of the sale at the time specified waives his right, the contract is kept alive against the buyer as well as against the seller, and neither can sue the other except for a breach thereafter occurring.

8. SALES—*Waiver by Buyer of Right to Rescind.*—A buyer, who, after failure of seller to deliver within the specified time, insisted on the performance of the contract, waived his right to rescind for failure to deliver on time.

9. SALES—*Readiness and Ability to Perform—Harmless Error.*—In an action by a seller against buyer for failure to receive the subject matter of the sale, plaintiff must show that he was not only ready and willing to perform his part of the contract, but was able to do so. But where an instruction in this connection omitted the word "able" and no objection was raised to the instruction on this account, and, under the evidence, the jury could not have been misled by its omission, the error is harmless.

10.  SALES—*Readiness to Perform—Question for Jury.*—There was evidence in the instant case that the seller was ready, willing and able to perform his part of the contract, and the question was properly submitted to the jury.

11.  SALES—*Damages—Breach by Buyer.*—In the instant case the subject matter of the sale was wool half hose, the output of twenty machines for a year.  Both seller and buyer estimated the probable output at one hundred and fifty dozen a day of wool half hose.  The price to be paid was fixed by the contract, and a witness for plaintiff testified as to the cost of production and also estimated the capacity of the machines at one hundred and fifty dozen a day.  Defendants' expert thought the capacity of the machines to be about one hundred dozen a day.

*Held:*  That there was evidence of a sufficiently definite character to enable the jury to arrive at the damages sustained by the plaintiff.

12.  APPEAL AND ERROR—*Reversal—Demurrer to Evidence—Rule.*—Although as the evidence appears in cold print, without the advantage possessed by the jury and the trial court, the Supreme Court of Appeals probably would not have found or approved the verdict which was found by the jury and approved by the trial judge, that will not justify that court in setting aside the verdict, unless, after considering the case as on a demurrer to the evidence by the plaintiffs in error, it is of opinion that the verdict is without evidence to support it, or is plainly contrary to the evidence.

13.  SALES—*Existence of Contract—Question for Jury.*—In an action by a seller against buyer for failure to accept goods sold, defendant contended that there had been a verbal contract between the parties embracing these and other goods, and that a letter by defendant to plaintiff embraced the terms of the contract.  It was further insisted that this contract for the two kinds of goods was indivisible and could not be relied on in part and rejected in part, and further, that if the defendants in good faith believed that the contract embraced both kinds of goods and the plaintiff believed otherwise, there was no meeting of the minds of the parties, and hence no contract.  The plaintiff denied that there had been any such verbal contract, and contended that the letter was a mere proposal concerning matters which the parties had discussed, that it did not contain the time and terms of payments or the duration of the contract, and that the plaintiff was free to accept any portion or all of the proposals; that the acceptance or rejection could be made within a reasonable time, and could be either oral or in writing; that, through its manager, it orally declined to accept the proposal as to one kind of goods, and accepted the proposal

as to the other. Evidence was introduced to sustain each of these contentions, and the trial court fairly and fully submitted the question to the jury by instructions to which neither party objected.

*Held:* That a verdict of the jury in effect sustaining the contention of the plaintiff could not be interfered with.

14. SALES—*Abandonment of Contract—Question for Jury.*—In the instant case there was much evidence tending strongly to show that the contract had been abandoned by both parties to it, but whether or not it had been so abandoned was plainly a question for the jury whose verdict enforcing the contract cannot be disturbed.

15. SALES—*Breach of Contract—Rescission—Assent of Both Parties.*—A breach of contract by one of the parties thereto, is by no means a rescission. It is a mere offer to rescind which the other party may either accept or reject. The offer must be accepted before a rescission is complete. It takes the assent of both parties to rescind. Rescission is the undoing of a contract, and the assent of both parties to it is as essential as it is to its making.

16. SALES—*Tendering Samples.*—A seller of goods tendered samples of the goods sold to the buyer. The act of furnishing the sample is not a performance of the contract, but a mere tender of performance as far as performance is then possible. If the seller relies upon the sufficiency of his tender to keep the contract alive and hold the buyer to complete performance it is necessary for him to show that the tender was made in good faith, with a present ability and willingness to perform, and that seller had kept himself ready to perform whenever called upon by the buyer to do so during the life of the contract, and also the seller must have done nothing to waive his rights growing out of a breach by buyer.

17. SALES—*Notice That Buyer Refuses to Accept Goods—Duty of Seller.*—Where a contract of sale required the seller to ship or store the goods which were its subject matter, the seller was relieved of this duty by the refusal of the defendants to accept a sample of goods which conformed to the contract. It would be an idle performance for the seller to manufacture goods which the buyer had notified him in advance that he would not receive. If after such breach the buyer changed his mind, he should have notified the seller and given him a reasonable opportunity to perform the contract.

Error to a judgment of the Circuit Court of city of Norfolk, in an action of asssumpsit. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

This is an action of assumpsit brought by the Aetna Hosiery Co. (hereinafter called the plaintiff), against The Norfolk Hosiery and Underwear Mills Co. (hereinafter called the defendant), to recover damages for failure to accept and pay for goods ordered by the defendant of the plaintiff. The defendant is a partnership composed of Joseph B. Hecht and Morton E. Hecht, trading and doing business under the name of The Norfolk Hosiery and Underwear Mills Co. There was a verdict and judgment for the plaintiff, and to that judgment a writ of error was awarded the defendant.

In the transactions which led up to the present litigation, the plaintiff was represented by Charles S. Holden, its manager, and the defendant by Joseph B. Hecht, a member of the firm. The plaintiff was a manufacturer of hosiery located at Worchester, Mass., and the defendants were wholesale dealers in hosiery, located at Norfolk, Va. Holden and Joseph B. Hecht were personal friends, and the defendants had been purchasing hosiery from the plaintiff four or five years before the present controversy arose. In the fall of 1914, a few months after the great war in Europe began, the defendants had placed with the plaintiff two orders for the manufacture of half hose, one for 1000 dozen per week at $1.07½ per dozen, and the other for 1000 dozen per week at $1.20 per dozen. These orders were to run until March 1, 1915. These two orders were filled by the plaintiff and paid for by the defendants, and need not be further noticed. They are referred to in some of the subsequent correspondence. The plaintiff had hitherto manufactured only fine goods, but the defendants al-

so wished to purchase large quantities of coarser goods, knit on larger needles, for the use of the soldiers in France. These, the plaintiff was not prepared to manufacture. On January 5, 1915, Holden and Hecht, representing the plaintiff and the defendants, respectively, met in the city of New York and discussed the situation. The parties are not agreed as to what took place at this meeting. On the day of this meeting, to-wit: January 5, 1915, the defendants addressed the following letter to Holden:

"The Norfolk Hosiery and Underwear Mills Co.
Norfolk, Va., Jan. 5th, 1915.
"Mr. C. S. Holden,
Worcester, Mass.
"Dear Sir:

"Confirming our talk of this morning, it is understood that in addition to the 2,000 dozens, or more, per week, of the grades of wool half hose that you are now making on contract for me at $1.07½ and $1.20, you will also purchase immediately up to 20 76 needle machines, or a sufficient quantity of same to make a product of 150 dozens per day of wool half hose, weighing approximately 2 pounds (8) eight ounces, and containing approximately 50% wool and 50% cotton, at $1.65 per dozen, freight paid to New York. I agreed to advance to you the full cost of these 20 machines, or any part of same that you require for the purchase of the machine equipment, and the Aetna Hosiery Co., endorsed by Mr. C. S. Holden personally, agreed to pay back to me the money advanced for the purchase of these machines, any time within eighteen months, with interest charges at 6% per annum.

"The product of these machines to be shipped to McClure & Company, No. 366 Broadway, New York City; the invoices covering same to be sent to the Norfolk Hosiery and Underwear Mills Company, Norfolk, Va. The cases to be

packed approximately 100 dozen, and each case to be marked (J B) No. 1 and up.

"In addition to the above, it is further agreed that the Aetna Hosiery Company will give us an output of not less than 750 dozens per week of 128 and 144 needle machines at $1.65, which are to contain not less than 50% wool, and are to weigh not less than 2 pounds 4 ounces. Cases shipped on this order are to be marked (J H) No. 1, and up, and also, of course, to have net and gross weights and dimensions on invoices and cases.

Yours very truly,

"Norfolk Hosiery and Underwear Mills Co.,

By Jos. B. Hecht."

The coarser goods which defendants desired to obtain are those referred to in the above letter as the "76 needle" goods. It will be observed that the above letter does not fix any time during which the goods are to be furnished, nor the time or terms of payment therefor. On January 13, 1915, the plaintiff wrote to Hecht, and in the course of that letter says, in reference to the 76 needle goods, "Would you state the time you would be able to take this production for? * * * When I was in New York you told me you would be willing to give me a contract covering the year 1915. I do not know as I would want to take a contract like that at present—unless I could cover for stock ahead at about the present prices. I am very anxious to make as big a showing for the company the coming year as possible and I believe you are willing to help me out and assure us about this by showing your faith in the demand for these goods for the coming season."

To this letter Hecht replied from New York on January 14, 1915, as follows:

"My dear Mr. Holden:

"I have your letter of the 13th, and your report on the seconds at $1.05 is satisfactory.

"I note carefully your paragraph in regard to the 76 needle machines. I hope you will get these in a hurry, installed and ready to ship without delay.

"As regards to your question about how long we will take your production, we agree to take the production of these machines at the rate of 150 dozens per day, or more, at $1.65, freight paid to New York. The weight to be 2 pounds and 8 ounces, 50 per cent wool and 50 per cent cotton. I agree to take these goods from you as fast as you make them for a full year. Trust you will view this favorably, and hope to have very large shipments from you daily, as our friends at this end are pushing us hard for the goods here.

"With kind regards,

"Yours truly,

"J. B. Hecht."

On the next day, January 15, 1915, the plaintiff wrote Hecht as follows:

"My dear Mr. Hecht:

"We accept your order dated January fourteenth, for one (1) year from February first, to make you one hundred fifty (150) dozen per day, or the production of twenty (20) Banner machines seventy-six (76) needle, four (4) inch gauge, as per your specifications to weigh two (2) pounds eight (8) per dozen and to contain fifty per cent (50%) wool and fifty per cent (50%) cotton, at $1.65 per dozen; net cash upon receipt of goods F. O. B. New York City, or storehouse receipt. We shall begin to ship out some of these next week.

"We also accept your proposition to loan us for eighteen

(18) months, $1,800.00 on these twenty (20) machines, with interest at six per cent (6%) per annum; we to have the option of paying the same at any time before the expiration of the above eighteen (18) months.

"Respectfully,<br>"Aetna Hosiery Company."

This completes the correspondence so far ‚as it relates to the making of the contract which is the basis of this action. The plaintiff knew that the goods were being ordered for the use of the soldiers in France, and that time was a most essential element of the contract. It is claimed by the defendants that the letter of January 5, 1915, embodied the terms of a parol contract which was entered into between the parties on that day, and that the letters of January 14, 1915, and January 15, 1915, fixing the period during which the goods were to be furnished, applied as well to the goods to be made on the 128 and 144 needle machines, as to those to be made on the 76 needle machines, and that the contract was one entire contract. Holden, representing the plaintiff, denies that there was any such parol contract on January 5, and says that the letter of Hecht of that date was a mere proposition along the lines of their discussion and that the part relating to 128 and 144 needle goods was never accepted by him. His language is, "Well, we didn't accept any order of them. The thing was still in abeyance; that is, we had talked backwards and forwards in his office and over the phone. We have talked about making something of that kind, but I did not accept any order on them because, as I say, we had talked this matter backwards and forwards but I did not accept any order on that number on those machines." He states that he would have been glad to have had the order, and could have made money on it, but did not accept it, "because we didn't consider that we could make it in con-

nection with the other order." The dealings between the parties were conducted in part by personal interviews, in part by conversations over the telephone, and there was a voluminous correspondence. From January 15 to February 24, 1915, the defendants were urgently insisting upon the prompt delivery of the 76 needle goods, and the plaintiff was explaining the difficulty of obtaining the needed machinery for their manufacture, and from time to time promising delivery. Both parties knew that the machinery had to be purchased, and it sufficiently appears from the evidence that the plaintiff did all it could be reasonably expected to do to obtain it in time to begin delivery by February 1st, but without success. On February 23rd, a letter from each party to the other crossed in the mails. These letters are as follows:

"New York, Feb. 23, 1915.

"Mr. C. S. Holden,

"Aetna Hosiery Co.,

"Worcester, Mass.

"My Dear Mr. Holden:

"I have your letter of the 20th, and really think, unless you have a place to put the goods, that you had better order the ten cases returned to Worcester. I doubt that you will have a place to sell them, although you might, and it will be very much cheaper and safer to have the goods in your mill, and hold there until we can get further delivery orders on the goods.

"I am very optimistic about the prospects of new contracts on the 515 and 50N, but until these new contracts have come across complete, with the financial end on a basis satisfactory to me, I cannot permit you to ship. Now, do not understand for a minute that I want to hold you for your production on these goods. It would not be fair of me to ask it. If you have an opportunity to sell this product of yours elsewhere, just go ahead and do it.

"After Wednesday of this week, please make no shipments of any kind. Also, do not ship any of the heavy goods on the 84 needle or 108 needle contract, or any goods of any character *expecting* No. 50N, and discontinue shipping No. 50N after Wednesday.

"As soon as matters here take a different shape, I will advise you promptly, and you know this.

"With kind regards,

"Yours truly,

"J. B. Hecht."

"February 23, 1915.

"Mr. J. B. Hecht,

"New York City,

"Friend Hecht:

"We are sending you by express sample dozen of the seventy-six (76) needle hose. These are in a small size and you will notice weigh forty (40) ounces. These are scoured very hard and as you will see are very dry, so you will find they will gain nearly (2) ounces going across the water. They are very clean. We think you will find they test about 53 to 55% wool. We think they are now coming through very nicely. We can begin to ship some of these right away.

"We will begin to send you tomorrow noon all the cases we have on the 50N and express at night whatever we can get off in the afternoon.

"We have the twenty (20) machines all tested out and you can send us check for $1,800 any time you wish. According to the agreement we had with the Hemphill Company was to pay for them $90 NET CASH.

"Thanking you in advance,

"Respectfully,

"Aetna Hosiery Company."

On February 24, 1915, Hecht wrote the following letter to Holden:

"New York, Feb. 24, 1915

"Mr. C. S. Holden,

"Aetna Hosiery Co.,

"Worcester, Mass.

"My dear Mr. Holden:

"I have your letter of the 23rd, and I also received this morning the dozen half hose, 76 needle. I do not like the look of this dozen goods at all, and I am returning it to you today. Of course, I wrote you the other night not to make any shipments of any sort, other than the 50N, until I advise you, but it looks now as if we would be able to start again full blast on wool socks in a very few days, but, until I do advise you, do not ship anything except the No. 50N, which you will have closed by tonight's shipment.

"I am also handing you herewith the notice of arrival of the eight cases which I asked you to order back, and I suppose you have done so.

"Will keep you posted with any change in the situation.

"With kind regards,

"Yours truly,

"J. B. Hecht."

Thereafter no further samples were demanded or sent, and no further explanation was asked or given for refusing the samples, but the plaintiff made repeated demands upon the defendants to remit the $1,800 agreed to be advanced by the defendants to pay for the 76 needle machines. Some of these demands were not answered, others were answered by suggested arrangements different from the terms agreed on, but in the result the $1,800 was not advanced, and no satisfactory arrangement made in relation thereto. Holden testifies that the plaintiff was able, ready and willing

to supply the 76 needle goods at all times from February 24, 1915, till February 1, 1916; that he had the materials, the machinery and the labor and simply awaited the acceptance of the sample tendered, or an order to proceed with the manufacture. He further testifies that the sample tendered measured up to the requirements of the contract. There was some conflict on this question growing especially out of the use of wool waste, but on a demurrer to the evidence the statement of Holden must be accepted as true. In addition to the evidence hereinbefore mentioned, the plaintiff relies upon the subsequent correspondence between Holden and Hecht, hereinafter quoted, to show a breach of the contract to accept the goods. It was claimed by the defendants that they demanded of the plaintiff the output of these machines through their associates, McClure & Co. about April 30, 1915, but this is flatly denied by Holden in his testimony. During the period covered by the contract, the plaintiff manufactured something over 11,000 dozen half hose on the 76 needle machines, but they were not manufactured under any particular contract and none of them were tendered to the defendants. Part of them were sold, and the residue were on hand at the time this action was brought.

*H. W. Anderson, Tazewell Taylor* and *Barnard & Hecht,* for the plaintiff in error.

*R. R. Hicks,* for the defendant in error.

BURKS, J., (after making the foregoing statement) delivered the opinion of the court.

[1, 2,] This action was brought in June, 1916, by the Aetna Company against the Norfolk Company to recover damages for the failure on the part of the defendants to accept

and pay for the output of the 76 needle machines from February 23, 1915, to February 1, 1916. The defendant. pleaded non-assumpsit, and a special plea of recoupment. under section 3299 of the Code. The special plea. sought to recover damages of the plaintiff for failure to manufacture and deliver to the defendants the goods called for in the agreement alleged to have been made on January 5, 1915. It is earnestly insisted by counsel for the plaintiff that "When the defendant filed its. special plea it forever waived its right to defend on the ground that it had rescinded the contract because of the failure of the plaintiff to begin deliveries on February 1st." In this, counsel for the plaintiff is clearly mistaken. The continued existence of the contract was put in issue by the plea of *non assumpsit,* and while there could be no recoupment if the contract did not exist, and to this extent the two pleas are inconsistent, this is not a valid objection, for the defendant may plead as many several matters of law or fact as he deems necessary. Code, sec. 3264. Not only so, "but with us inconsistent pleas are allowable, and in trying one, the court cannot look to the existence of the other, hence we look upon each branch of the pleading as. totally separate and distinct from every other, and the defenses under one cannot be straightened or curtailed by the existence of the other. Were it otherwise, the liberty of pleading several, and even contradictory, pleas would be defeated. *McNutt* v. *Young,* 8 Leigh (35 Va.) 542, 553. Nothing is more common in practice than contradictory pleas. In the case at bar, if the defendant did not seek any recovery over and above the plaintiff's claim, there was no necessity for the special plea as the defense set up by it might have been shown under the general issue of non-assumpsit. *Columbian Accident Ass'n.* v. *Rockey,* 93 Va. 678, 25 S. E. 1009; Burks' Pl. & Pr. section 239.

[3] On the trial, the court gave six instructions on the motion of the defendants. Some of them were probably more

favorable to the defendants than they should have been, but this is not assignable error. Not by the defendants, because they were favorable to them and asked by them, nor by the plaintiff because it was not injured by them, as the verdict was in its favor.

The action of the trial court in refusing defendants' instruction number three is assigned as error. This instruction was as follows:

"The court instructs the jury that if they believe from the evidence that a contract existed between the Aetna Hosiery Company, the plaintiff, on the one hand, and the defendants on the other, whereby the said plaintiff agreed and undertook for the period of one year beginning February 1, 1915, to make and deliver to the said defendants 150 dozen pair of 76-needle socks per day, for the consideration of $1.65 per dozen, and that it failed to make and deliver said socks at the time specified, and that said failure continued up to February 23rd, that then the defendants had a right to notify plaintiff not to ship any goods after that time, and their so doing did not constitute on their part a breach of the contract sued on, and the jury shall so find."

[4] There was no error in refusing this instruction. Undoubtedly time was of the very essence of the contract in suit, and the parties fully realized that fact, and there is no need to cite authority for the elementary proposition that in such case there can be no recovery upon the contract in case of failure to perform within the time stipulated. But there is no reason why one party who had a right to rescind because of the breach by the other may not waive that right and hold the other party to performance. The law on this subject is well settled. Conceding that the contract bound the plaintiff to begin deliveries on February 1, 1915, the instruction wholly ignored the evidence tending to show a waiver of this provision of the contract, and left the

jury free to find for the defendants on this question not-withstanding such waiver. It presented only a partial view of the evidence, as to the rights of the parties, respectively, under the contract. It is true that the instruction does not in terms direct a verdict for the defendants, but, ignoring all evidence tending to show that the defendants had waived their rights under the contract, it tells the jury that under the contract "the defendants had a right to notify the plaintiff not to ship any goods after that time, and their so doing did not constitute on their part a breach of the contract sued on, and the jury shall so find." No other instruction given in the case dealt with the subject of waiver by the defendants of their rights under the contract, and to have given the instruction, as asked, would have been misleading. In *New York, etc., R. Co.* v. *Thomas,* 92 Va. 606, 609, 24 S. E. 264, 265, it is said:

[5] "Calling the special attention of the jury to a part only of the evidence and the particular fact or facts it may tend to prove, and ignoring the residue of the evidence and the facts it may tend to prove, gives undue prominence to such recited evidence, and disposes the jury to regard it and the fact it tends to prove as the particular evidence, and the fact to be relied on in determining the issue before them, and thus mislead them.

[6]. "Instructions in writing are carried by the jury to their room when they retire to consider of the verdict, and, if they contain a rehearsal of a part only of the evidence, their tendency is to impress unduly on the jury such part of the evidence, to the disadvantage of the other evidence in the case, which may be equally or more important in determining the issue, but rests only in the memory of the jury." For other cases on the same subject, see Burks Pl. & Pr., sec. 268, note 15.

[7, 8] The defendants insisted, and the court so instructed the jury at their instance, that their letter of February 23

was a mere shipping direction and "that it was not intended thereby to terminate the contract." If this be true, then the contract continued in force, and if the failure of the plaintiff to make deliveries between February 1 and February 23, 1915, gave the defendants the right to rescind, they waived those rights and elected to hold the plaintiff to its contract. The defendants were within their rights in doing this, but when they kept the contract alive against the plaintiff they kept it alive also in its favor and against themselves, and neither could sue the other except for a breach thereafter occurring.

In *Frost* v. *Knight*, L. R. 7 Ex. 111, it is said:

"The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequence of non-performance; but in that case he keeps the contract alive, for the benefit of the other party as well as his own; he remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it."

In *Bernstein* v. *Meech*, 130 N. Y. 354, 358, 29 N. E. 255, 256, it was said:

"But whatever view may have been taken of the right of the defendants to treat the contract for the purpose of its performance as at an end, and to act upon that assumption when they received the plaintiff's letter, they disposed of that question by their letter to him. By this it appeared that the defendants elected to keep the contract in force for the purposes for which it was made. This operated alike upon the rights of both parties, and the plaintiff was justified in so understanding it. In that view the contract was kept alive until the time arrived for performance and the

obligations of the defendant no less than those of the plaintiff for ·the purpose remained effectual." See also *Inman* v. *Elk Cotton Mills,* 116 Tenn. 141, 92 S. W. 760.

The defendants' letters of February 24, 1915, and April 12, 1915, also seem to indicate that the defendants intended to insist on the performance of the contract, and the testimony of W. P. McClure, who was associated with the defendants in this contract, and who was examined in this cause as witness on their behalf, is to the effect that between 20th and 25th of April, 1915, he had a talk with Holden "with reference to getting of any of these goods," but could not get them. Hecht also testifies that he tried to get all machine goods from the plaintiff after April 12, but without success, and Holden testifies that the defendants attempted to get goods from him on this order in April, 1915. We have no difficulty, therefore, in arriving at the conclusion that the defendants waived whatever rights of rescission they had for failure of the plaintiff to make deliveries prior to February 23, 1915.

[9] The next assignment of error is to the action of the court in granting the following instruction, on the·motion of the plaintiff:

"The court instructs the jury that if they believe from the evidence that the contract mentioned in the declaration, was entered into between the plaintiff and defendant and that the plaintiff was ready and willing to perform the same, and that performance thereof was prevented by defendant without fault of the plaintiff, then there was a breach of the contract by defendants."

There is omitted from this instruction the word "able," which should have been inserted in order to make it accurate. It was necessary that the plaintiff should have been not only " ready and willing to perform," but also *able* to perform the contract. But no such objection was raised to the instruction either in the trial court or this court, and,

under the evidence, the jury could not have been misled by its omission.

[10] The objection to the instruction is that "It was earnestly contended before the trial court, and is now just as seriously urged, that the evidence in this case discloses the fact, not only that the plaintiff was not ready and not willing, but that, on the contrary, the exact opposite condition existed." The instruction with the suggested insertion made correctly propounds the law, and there was more than a mere scintilla of evidence in the cause upon which to base it. The plaintiff's manager testified that the sample tendered conformed to the contract, but was rejected; that the plaintiff was ever thereafter during the year ready, able and willing to perform the contract, but received no orders to proceed, and that the only reason for non-performance was the attitude and conduct of the defendants. Whether the facts were, as hypothetically stated in the instruction, was a question for the jury, and was properly submitted to them.

[11] The third assignment of error is to the action of the court in granting the following instruction, on the motion of the plaintiff, to-wit:

"The court instructs the jury that if they believe from the evidence that the plaintiff is entitled to recover in this case, then they should proceed to assess the damages to which it is entitled and the court further instructs the jury that in ascertaining such damages, they should first determine from the evidence in this case what the entire costs would have been to the plaintiff to complete its contract with the defendants, and after ascertaining the costs of completion, to deduct the same from the sum which the plaintiff would have been entitled to receive from the defendant under the terms of the contract, if the same had been performed. From this result they should then deduct any profits which the evidence shows were made by plaintiff by using the 76

needle machines described in the evidence. The result thus ascertained will be the damage which the plaintiff is entitled to recover in this action."

The objection to this instruction is that the contract calls for the *output* of 20 machines, when the evidence fails to show what that output was, or what the profit was per dozen, and hence the jury did not have before them sufficient data upon which to base a verdict. The defendants' letter of January 5th says: "You will also purchase immediately up to 20, 76 needle machines or a sufficient quantity of same to make a product of 150 dozen per day of wool half hose." The plaintiff's letter of acceptance of January 15th, accepted the order "to make you one hundred and fifty (150) dozen per day, or the product of twenty (20) Banner machines." Both parties calculated that the twenty machines would make one hundred and fifty dozen per day. The price to be paid for the goods was fixed by the contract. Holden testified for the plaintiff that the price of the material, and the costs of manufacture amounted to 96 55/100 cents per dozen, and an itemized statement of how the amount was arrived at was laid before the jury. Another witness, disinterested, testified that the prices given by Holden were reasonable. While Holden had not actually tested the capacity of the machines, because there had been no necessity to do so, he estimated their capacity at one hundred and fifty dozen per day, and, figuring on this basis, placed the plaintiff's loss of profits at $26,255.62. The expert placed on the stand by the defendants thought that the product of the machines could not be safely placed at over 500 dozen per week. Counting five working days per week, as is done by the plaintiff in error, that would be 100 dozen per day. If this be taken as the proper basis, it would reduce the plaintiff's profits by one-third, and ascertain its loss, on the basis of profits testified to by Holden, at $17,503.75, but from this there were to be some deductions

testified to by Holden, and mentioned in the instruction. The jury fixed the plaintiff's damages at $17,100. In view of these facts, we cannot say that "there was no evidence of a sufficiently definite character to enable the jury to arrive at the damages sustained by the plaintiff."

[12] The last assignment of error is that the court erred in refusing to set aside the verdict on the ground that it was contrary to the law and the evidence. As the evidence appears in cold print, without the advantage possessed by the jury and the trial court, we probably would not have found or approved the verdict which was found by the jury and approved by the trial judge, but that will not justify this court in setting aside the verdict, unless, after considering the case as on a demurrer to the evidence by the plaintiffs in error, we are of opinion that the verdict is without evidence to support it, or is plainly contrary to the evidence. *Jackson* v. *Wickham,* 112 Va. 128, 70 S. E. 539, and cases cited.

[13] There has been much argument on the subject of the divisibility of the contract, and counsel have ably discussed the authorities pro and con, but before entering upon that question it is necessary to first ascertain what was the contract between the parties. Only after this has been ascertained will it be necessary to determine whether or not that contract was divisible, provided any such question is involved in it. The defendants contended that there had been a verbal contract between the parties on January 5, 1915, and that it embraced not only the 76 needle goods, but also the 128 and 144 needle goods, and further that the letter of Hecht of that date contained the terms of the contract. It was further insisted that this contract for the two kinds of goods was indivisible and could not be relied on in part and rejected in part, and further, that if the defendants in good faith believed that the contract embraced the 128 and 144 needle goods and the plaintiff be-

31

lieved otherwise, there was no meeting of the minds of the parties, and hence no contract. The plaintiff denied that there had been any such verbal contract, and contended that the letter of anuary 5th was a mere proposal concerning matters which the parties had discussed, that it did not contain the time and terms of payments or the duration of the contract, and that the plaintiff was free to accept any portion or all of the proposals; that the acceptance or rejection could be made within a reasonable time, and could be either oral or in writing; that, through its manager, Holden, it orally declined to accept the proposal as to the 128 and 144 needle goods; and that by the letter of January 15, 1915, it accepted the proposal as to the 76 needle goods upon the terms therein stated. Evidence was introduced to sustain each of these contentions, and the trial court fairly and fully submitted the question to the jury by instructions to which neither party objected. By instruction B, given for the plaintiff, the court told the jury:

"The court instructs the jury that in order to constitute a contract there must be an agreement of the parties, or meetings of the minds—upon the particular question at issue. A mere proposal, without an acceptance would not create a contract."

By instruction D, given for the plaintiff, the court told the jury that if they believed from the evidence that no time was specified during which the plaintiff was to furnish the 128 and 144 needle goods, it had the right to terminate the order at the end of any week. Instruction 5, given for the defendants, was as follows:

"The court instructs the jury that if they believe from the evidence that the plaintiff understood that the contract between it and the defendants only contemplated the making and delivery by the plaintiff at the rate of 150 dozen per day of half hose made on 76 needle machines and the defendants on their part understood that the contract be-

tween the plaintiff and defendants contemplated in addition to the 76-needle goods, the making and delivery by the plaintiff, at the rate of not less than 750 dozen per week of half hose made on 128 and 144-needle machines, that then and in that event there was a mistake as to the subject matter of the contract, the result of which was that there was no meeting of the minds of the parties, and the jury shall find for the defendants."

The verdict of the jury, in effect, sustained the contention of the plaintiff, and with that finding we cannot interfere. This finding eliminates any further consideration of the 128 and 144 needle goods.

[14] There was much evidence tending strongly to show that the contract had been abandoned by both parties to it, but whether or not it had been so abandoned was plainly a question for the jury whose verdict enforcing the contract cannot be disturbed.

As hereinbefore pointed out, nondelivery prior to February 23rd was waived, but the jury had further to consider whether or not there was a breach of the contract by the defendants on or after February 23rd which gave the plaintiff a right of recovery. On February 24th the plaintiff tendered to the defendants a sample of the half hose to be manufactured accompanied by a letter, saying, "These are scoured very hard and as you see are very dry, so you will find they will gain nearly two (2) ounces going across the water. They are very clean." These samples the defendants rejected and returned because they did "not like the look of this 'dozen goods at all." Thereafter the plaintiff made no enquiry as to any other objections to the sample, furnished no other sample, made no other tender or delivery under the contract and manufactured no more goods under the contract, but relied upon what it had done as a sufficient tender of performance on its part. Viewed from the standpoint of a demurrer to the evidence, the defendants

made no demand for any further samples, gave no further explanation for the rejection of the sample furnished and made no further demand upon the plaintiff for the goods. The defendants offered evidence to prove that while the contract called for goods containing fifty *per cent.* wool, the sample furnished contained only wool waste, that the plaintiff knew the goods were for the French Government, and that they were of such character that if they had accepted them they would have been rejected and thrown on their hands by the French Government. There was evidence on behalf of the plaintiff that the sample conformed to the contract, that the wool was of the same character as that used in all other contracts with the defendants and was such as any well organized plant would have put into them under a like contract.

[15] If the goods conformed to the contract of the parties, it is immaterial what the French Government would have done upon inspection. The verdict of the jury for the plaintiff was, in effect, a finding that the sample conformed to the contract, and cannot be disturbed. This finding of the jury is a finding of a breach of the contract by the defendants. A breach of contract by one of the parties thereto, however, is by no means a rescission. It is a mere offer to rescind which the other party may either accept or reject. The offer must be accepted before rescission is complete. It takes the assent of both parties to rescind. Rescission is the undoing of a contract, and the assent of both parties to it is as essential as it is to its making.

[16] The act of the plaintiff in furnishing the sample was not a performance of the contract, but a mere tender of performance as far as performance was then possible. If the plaintiff relied upon the sufficiency of its tender to keep the contract alive and hold the defendants to complete performance it was necessary for it to show that the tender had been made in good faith, with a present ability and

willingness to perform, and that the plaintiff had kept itself ready to perform whenever called upon by the defendants to do so during the life of the contract. *Inman* v. *Elk Cotton Mills*, 116 Tenn. 141, 92 S. W. 760. It was also necessary, to entitle the plaintiffs to recover, that it should have done no act waiving its rights against the defendants growing out of the breach aforesaid. The plaintiff's manager testified on its behalf that the tender was made in good faith, and that on and after February 24, 1915, the plaintiff had the materials, the machinery and the labor necessary to perform the contract, that it was able, ready and willing to perform ever thereafter until February 1, 1916, the date of the expiration of the contract, that it took no orders from others for this class of goods but kept itself free and open to carry out the terms of the contract, and would have been glad to have had the order as it would have made a good profit on it.   There was some testimony on behalf of the defendants that they demanded of the plaintiff a part of the goods in the latter part of April, 1915, and could not get them, but this is denied by the plaintiff's manager upon whom the demand was said to have been made, and who testified that, at the date of the trial, the plaintiff still had on hand some of the goods which were referred to in his letter to the defendants' associates of April 29, 1915.

[17] While the contract required the plaintiff to ship or store the goods, it was relieved of this duty by the refusal of the defendants to accept the sample. It would have been an idle performance for the plaintiff to have manufactured goods which defendants had notified it in advance they would not accept.   If after this breach the defendants changed their mind and desired the goods they should have so notified the plaintiff and given it a reasonable opportunity to perform the contract, but this they failed to do.   Obviously, the verdict of the jury finding for the plaintiff on this question cannot be set aside.

Did the plaintiff, after February 24, 1915, treat the contract as rescinded, or release the defendants from their liability for its breach? For months after that date the plaintiff was repeatedly demanding of the defendants a check for $1,800—they had agreed to advance to pay for the machines to make the 76 needle goods. In addition to this, the correspondence between the parties is relied upon to show the continued readiness of the plaintiff to fulfill its contract, and the unwillingness of the defendants to take the goods. On March 27 Hecht wrote Holden:

"I am now very much at unrest on account of the lack of business for export, as I have such a large amount of my finances tied up in this business at this time and I am unable to make any further moves until future business develops."

In reply to this statement, Holden on March 30th wrote to Hecht as follows:

"We, of course, bought these machines with your promise to pay for them and also to take the production for one year. You have apparently disregarded taking the goods as agreed; and we hope you do not think of not paying for the machines."

On April 12th Hecht wrote to Holden:

"So far we have not been able to get the new orders on heavy wool socks, on a satisfactory financial basis, but I haven't any doubt that during the year we will get a great deal of business."

Holden wrote Hecht on April 17th:

"You know you told me if we would buy these machines you would take our production on them for one year even if you could not use them during the summer."

Hecht wrote Aetna Hosiery Company on April 21st, as follows:

"I am in receipt of yours of the 17th. We have no orders on heavy wool hosiery at this time, but we expect to have very large business later on in the season, at which time,

of course, I could readily use the output of your 76 needle machines. Until that time, however, I do not want any of the goods, and I am sure you don't want me to think about taking them unless I can sell them."

On May 17th, Hecht wrote Holden:

"It seems to me also that there should be an understanding between us that if we desire the product of these machines you will give us the same. We have booked some very large business recently, but it only covered, so far as the 84 needle product is concerned, actual merchandise that we had already made up in stock, but we have every reason to believe that we will have in the very near future some very large business for delivery September, October and November, of this year, in which case I will very probably need your assistance, and will advise with you concerning same later on. There is one point, however, that I might as well speak of at this time, and that is that the day of very long profit on the export hosiery business has passed. * * * It is no longer possible for me to give long profits to the manufacturer or to get long profits for ourselves."

On May 19th Mr. Holden replied to this letter and said in part:

"In letters since, it sounds as though you wanted us to feel you were doing us a kindness in paying for these machines. At the time, you were very anxious to get goods, and make the profit, and you were willing to concede most anything to get the goods. But as soon as business began to slack up you then refused to take the goods."

In reply to this letter Hecht, after acknowledging receipt of the letter of the 19th calling Hecht's attention to the refusal to take the goods, Hecht said:

"Now, as regards the output of these machines, of course you will operate them, and I did not mean in my previous letter that you should depend upon us for the sale of the output of them. You, of course, will sell all you can, and

if I can turn any business over to you that you want on new orders, which we, by the way, have none at this time, certainly I will let you hear from me, but I would say this. I haven't any doubt at all but what there is plenty of business coming this fall on wool socks for these machines."

Upon this and other evidence in the case, the jury found a verdict in favor of the plaintiff, and with this verdict we have no right to interfere. Upon the whole case, we are of opinion to affirm the judgment of the circuit court.

*Affirmed.*