WILLIAM LOCKWOOD et al., Respondents, *v.* EDWARD B. BARTLETT et al., Appellants.

Under the Quarantine Law of this state (Chap. 358, Laws of 1863, as amended by chap. 592, Laws of 1865), and the United States Statutes (§§ 4792, 4793), the health officer of the port of New York is clothed with power to use means to protect the public against *contagia* from infected vessels and cargoes arriving at that port.

Under the provisions of the Quarantine Act (Chap. 358, Laws of 1863, as amended by chap. 592, Laws of 1865), which declares that "whenever any expense shall be incurred by the health officer, or whenever any services shall be rendered by him or his employes in the discharge of the duties imposed upon him by law in relation to vessels, merchandise    *    *    * under quarantine, such expense and services shall be paid for, by the master of the vessels" to the health officer, and shall be a lien on the vessels, merchandise, etc, such charges can only be incurred through the official action or in execution of the orders, of the health officer, and are subject to his control; to create the lien, his official sanction and responsibility are essential.

In an action to recover damages for the alleged unlawful taking and detention of certain cargoes of rags imported by plaintiffs, it appeared that the warehouse of the defendants, who composed the firm of B. & Co., had, under the advice and with the approval of the health officer of the port of New York and of the health commissioner of Brooklyn, been designated by the secretary of the treasury as a warehouse for the storage and disinfection of imported rags. Robbins' Reef had also been designated as another place for disinfection. In pursuance of this authority the collector sent one cargo of the rags for disinfection to the warehouse of B. & Co., and another to Robbins' Reef. *Held,* that what was done in transferring the rags from the vessels to the selected warehouses was within the power of the health officer, and so that the charges for light-

Statement of case.

erage paid, in accordance with the custom, by B. & Co. on the rags sent to their warehouse, and the usual charges for storage for the time the goods properly remained in said warehouse were a lien upon the rags. The quarantine regulations promulgated by the health officer contained a provision to the effect that a vessel with rags from healthy ports would be required to furnish satisfactory evidence that the rags were gathered in districts where no suspicion of cholera existed; in default of which the cargo would be subject to the regulation applicable to rags from an infected port. The evidence required was an affidavit of the shipper, and the certificate of the United States consul at the port of shipment "that the person making the affidavit is a man of good character and entitled to credit." The rags in question came from a healthy port. There was an affidavit of the shipper, as required, but the consular certificate did not contain the statement required as to the character of the affiant. *Held*, that the proof was defective and the rags were properly held subject to said regulation.

A company had established disinfecting works at Robbins' Reef and was employed by the health officer to perform that work. The lighterage charges on the cargo delivered there were paid by B. & Co. The rags delivered to that firm were disinfected by it, the work being done without any employment or direction of the health officer, and without approval by him of the work or the charge therefor. Said firm refused to deliver the rags in its warehouse to plaintiffs unless the bills for lighterage and disinfection were paid, They were paid by plaintiffs under protest, and the rags were thereupon delivered to them. *Held*, that the charges for disinfection were not brought within the statute, as they had not the official sanction of the health officer; and so, that B. & Co. had no lien therefor, and so far as defendants required the payment of those charges as a condition of delivery, they were chargeable with duress of property and plaintiffs were entitled to recover back the same.

S., the health officer was made a party defendant, the complaint charging a conspiracy between him and the other defendants for the purpose of enabling them to create the charges and assert the lien. The jury failed to agree upon a verdict as to S., but rendered a verdict against the other defendants, which plaintiffs consented to and did accept. It was claimed that the verdict was ineffectual to sustain a judgment against the defendants other than S. *Held*, untenable; that the charge of conspiracy was not necessarily a controlling element and did not require a verdict for or against all of the defendants jointly; that plaintiffs having accepted the verdict there was no further support for the action against S., and as the action was in tort a verdict against the other defendants was proper.

(Argued October 15, 1891; decided December 22, 1891.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order

made November 7, 1889, which modified, and affirmed as modified, a judgment in favor of plaintiffs entered upon a verdict.

The plaintiffs were the owners and consignees of a quantity of rags imported from Hiogo, Japan, in ship Vigilant, which arrived at the port of New York, May 30, 1885, and imported from Leghorn, Italy, in bark Battaglia, which arrived at same port June 6, 1885.

. This action was brought to recover damages alleged to have been sustained by the plaintiffs by reason of the wrongful taking and detention of the rags, and to obtain the possession of which they were required to and did, under protest, pay the appellants a large sum of money claimed for the expenses of carriage, disinfection and storage for which charges were made. And they allege that this was consummated by conspiracy between the defendants Bartlett, Woodruff and Nitchie, partners constituting the firm of E. B. Bartlett & Co., and the defendant Smith. The defense was founded upon the alleged right through the authority derived from the United States treasury department, the collector and health officer of the port of New York. The defendant Smith was the health officer.

In December, 1884, E. B. Bartlett & Co. requested the United States treasury department to select their warehouse in the city of Brooklyn, and known as the Baltic Stores as a warehouse for the storage and disinfection of imported rags. The matter of the landing and storage of rags there for that purpose was referred to the health officer, who deemed it a proper place, and thereupon the treasury department approved the selection and instructed the collector of customs that where. rags requiring disinfection form part of a cargo, they be placed on lighters and taken to the place so designated, and if the whole cargo of a vessel was rags, they should be unloaded at that place.

On June 3, 1885, the collector, by general order, directed the inspector on board the ship Vigilant to send to the Baltic Stores all merchandise for which no permit or order had been received by him to the contrary of such direction, except articles of the character there mentioned. Rags were not

within the exception. And June ninth, under that general order, the collector directed such inspector to send on bonded lighters to Baltic Stores for disinfection all rags on the Vigilant for which no permit had been received. This was done accordingly. And certificates were afterwards made by the United States inspector of rags that they were disinfected.

With a view to the objection of the health authorities of Brooklyn to the storage of rags at the Baltic Stores for that purpose, permission was given to the disinfecting company to establish disinfecting works at quarantine. This was done at Robbins' Reef. On or about June 19, 1885, pursuant to the direction of the collector, the rags on the bark Battaglia were unloaded and by bonded lighters taken to Robbins' Reef for disinfection. The lighterage charges were paid by E. B. Bartlett & Co., and the bill for them and for disinfection and storage was made out to their credit against the plaintiffs, amounting to $4,904.90, on account of the rags taken from the Vigilant, and $409.25 on account of those taken from the Battaglia, and they refused to deliver the rags to the plaintiffs unless those bills were paid. They were paid by plaintiffs, under protest, about October 9, 1885, and the rags were then delivered to them. The trial court instructed the jury that the defendants, other than Smith, were liable to the plaintiffs for the amount so paid, with interest from the time of payment, and directed them to find accordingly; and submitted to them the question whether the plaintiffs were entitled to recover any and what amount of further damages arising out of the taking and detention of the property. Also submitted to the jury the question of liability of the defendant Smith. The jury were unable to agree on verdict for or against him, and they found a verdict against the other defendants for $8,000. Judgment was entered against them accordingly, with costs. The General Term reduced the recovery of damages to the amount paid by the plaintiffs to those defendants, with interest, and as so modified affirmed the judgment.

Further facts are stated in the opinion.

*Wm. W. Goodrich* for appellants. E. B. Bartlett & Co. had the right to detain the goods·under the order of the collector of customs and under the United States statutes. (U. S. R. S. §§ 2774, 2807, 2826, 2963, 2965, 2969, 4792, 4793.) E. B. Bartlett & Co. did not have control of the delivery of the rags. The goods were in the possession and under the control of the collector of the port and of the United States. (*U. S.* v. *Macdonald,* 2 Cliff. 271; *Clark* v. *Peaslee,* 1 id. 545.) E. B. Bartlett & Co. had the right to detain the goods under the authority conferred upon the health officer of the port of New York, by the laws of the state of New York. (Laws of 1863, chap. 358, § 28.) The judgment entered upon the verdict should be set aside on the ground that there was no verdict. (Code Civ. Pro. § 1186; *Soria* v. *Davidson,* 9 Civ. Pro. Rep. 23; *Wolf* v. *G. Ins. Co.,* 43 Barb. 400; *Van Schaick* v. *Trotter,* 8 Cow. 599; *Porter* v. *Mount,* 45 Barb. 422.)

*Charles W. Bangs* for respondents. The verdict upon which the judgment was entered was proper and sufficient in form, and valid in effect. (Code Civ. Pro. §§ 1106, 1204; *Murray* v. *N. Y. L. Ins. Co.,* 96 N. Y. 614; *Train* v. *Taylor,* 51 Hun, 215; *Warner* v. *N. Y. C. & H. R. R. R. Co.,* 52 N. Y. 437; *Mack* v. *H. R. R. R. Co.,* 56 How. Pr. 108; *Briggs* v. *Milton,* 99 N. Y. 531.) The action being one in tort, for wrongful injury to plaintiffs' property, a separate judgment against Bartlett & Co. could be rendered and entered. (Code Civ. Pro. § 1204; *McIntosh* v. *Ensign,* 28 N. Y. 169; *Brumskill* v. *James,* 11 id. 294; *Dominick* v. *Eacker,* 3 Barb. 17; *Montfort* v. *Hughes,* 3 E. D. Smith, 591; *L. O. Co.* v. *S., etc., Co.,* 42 Hun, 153; *Fay* v. *Lynch,* 17 Wkly. Dig. 348; Cooley on Torts, 126; *Hutchins* v. *Hutchins,* 7 Hill, 104; *Verplank* v. *Van Buren,* 76 N. Y. 259; *Wood* v. *Amory,* 105 id. 278; *Jones* v. *Baker,* 7 Cow. 445; *Place* v. *Minster,* 65 N. Y. 89.) The direction by the court of a verdict against E. B. Bartlett & Co. was proper. (U. S. R. S. § 2505; *Badger* v. *Guiterez,* 111 U. S. 734; *Tracy* v. *Swartwort,* 10 Pet. 80; *Conrad* v. *Ins. Co.,* 6

id. 262; *Underhood* v. *Green*, 42 N. Y. 140.)   The claim that Woodruff and Nitchie, Bartlett's partners in the firm of E. B. Bartlett & Co., were not liable, and that the complaint should have been dismissed as to them, is untenable.   (*F. S. Inst.* v. *Bank*, 80 N. Y. 170.)   The objections to the admission of testimony of transactions with Dr. Smith when Mr. Bartlett was not present, and of transactions with Mr. Bartlett when Dr. Smith was not present, are untenable.   (*Place* v. *Minster*, 65 N. Y. 89–105; *Verplank* v. *Van Buren*, 76 id. 260; *Apthorp* v. *Comstock*, 2 Paige, 482.)   The amount of the verdict and judgment, at least as modified by the General Term, is proper. (*Harmony* v. *Bingham*, 12 N. Y. 112; *Briggs* v. *Boyd*, 56 id. 293.)   Upon this appeal, this court will not determine or review any question of fact arising upon conflicting evidence in the court below.   (Code Civ. Pro. §§ 1337, 1338; *Green* v. *Fortier*, 80 N. Y. 640; *Bigelow* v. *Legg*, 102 id. 652; *Platt* v. *Platt*, 58 id. 646; *In re Bull*, 111 id. 624; *Goodwin* v. *Conklin*, 85 id. 21; *In re Ross*, 87 id. 514; *People* v. *French*, 92 id. 306; *Davis* v. *Leopold*, 37 id. 620 ; *Hackford* v. *R. R. Co.*, 53 id. 654; *N. Bank* v. *Westcott*, 118 id. 473; *Dillon* v. *Cockcroft*, 90 id. 649 ; *Innes* v. *Dauchy*, 82 id. 473; *Colligan* v. *Scott*, 58 id. 670 ; *Provost* v. *McEncroe*, 102 id. 650.)

BRADLEY, J.   The question of the liability of the defendants other than Smith, as presented at the trial, was by the parties treated as one of law only, so far as related to the claim for the money paid by the plaintiffs to obtain the possession of the goods, and to which amount the modification of the judgment by the General Term reduced the recovery.   And if there was any evidence to support it to that extent, the direction of a verdict for that sum was without error, unless the exceptions having relation to the nature of the action, or the efficiency of the verdict, were well taken.   (*Winchell* v. *Hicks*, 18 N. Y. 558; *Dillon* v. *Cockcroft*, 90 id. 649.)

The plaintiffs were the owners of the rags, and they were unconditionally entitled to possession of them, and without payment of the charges asserted against them, unless by force

of some rule of law, regulation or authority the goods were lawfully taken and detained for the alleged purposes and subjected to the lien of charges for carriage, disinfection and storage, or for some portion of them. The defendants contend that the rags were taken and treated pursuant to legal authority, and that the amount of the charges so claimed was a lien upon the property, by which was justified the refusal of Bartlett & Co., until payment was made, to deliver it to plaintiffs.

Sanitary regulations are properly and necessarily provided for and applied at ports of entry for vessels and cargoes from foreign countries. And the health officer of the port of New York is clothed with power to use means to protect the public against *contagia* from infected vessels and cargoes arriving there from elsewhere, pursuant to the statute " establishing a quarantine, and defining the qualifications, duties and powers of the health officer for the harbor of New York." (L. 1863, ch. 358; L. 1865, ch. 592.) And it is provided by the statutes of the United States that the quarantine and other restraints established by the health laws of any state respecting any vessels arriving in any port thereof shall be observed by the officers of customs, etc., and all such officers of the United States shall faithfully aid in the execution of such quarantine and health laws, and as they shall be directed from time to time by the secretary of the treasury. (U. S. R. S. § 4792.) And whenever, by the health laws of any state or by the regulations made pursuant thereto, any vessel arriving within the collection district of such state is prohibited from coming to the port of entry or delivery, and such health laws require or permit the cargo of the vessel to be unladen at some other place within or near the district, the collector, after due report to him, may grant his warrant or permit for the unlading or the charge thereof under the care of the surveyor or of an inspector at some other place where such health laws permit, and upon the conditions and restrictions which shall be directed by the secretary of the treasury. (Id. § 4793.) The rags were free from duty, and the only ground upon which the detention of them from the plaintiffs could lawfully be justi-

fied, is that it was with a view to the protection of the public health. This was apparently the object, and whether the action was duly had for that purpose remains to be considered.

By reference to orders and circulars from the treasury department to the collector and through the latter, as well as by regulations of the health officer, it appears that provision was made with a view to such protection.

In the quarantine regulations promulgated by the health officer in August, 1884, was the provision that vessels with cargo wholly or in part rags from an infected port or district would not be given pratique, " vessels with rags from healthy ports would be required to furnish satisfactory evidence that they had been gathered in districts where no suspicion of cholera existed, in default of which the cargo would be subject to the regulation which related to such a cargo from an infected port." And that the evidence " must consist of an affidavit made by the original shipper before the U. S. consul at the port of shipment that the rags have not been gathered in cholera-infected districts and the certificate of such consul *that the person making the affidavit is a man of good character and entitled to credit.*" In the consular certificate annexed to the affidavit of the shipper of rags on the Vigilant the requirement relating to the character and credit of the affiant was not observed.

By circular issued by the secretary of the treasury in November, 1884, the unlading of rags from infected ports, amongst which were classed France, Italy and all Mediterranean and French ports, was prohibited, and it was directed that no old rags should be landed at any port of the United States, except on a certificate of the U. S. consular officer at the port of departure that they were not gathered or baled at or shipped from any infected place or any region contiguous thereto, and that the order would not be construed to allow the unlading of any old rags, except upon the usual permit of the local quarantine or health officers. This circular directed to officers of customs and others, was in harmony with the regulations of the health officer and in aid of their enforcement.

In December following, another circular of the secretary of the treasury in like manner issued to the collector of customs, directed that no old rags except those afloat before January 1, 1885, on vessels bound directly to the United States, should be landed there from any vessel, except upon disinfection at the expense of the importers. And on January 12, 1885, in a circular of the secretary of the treasury to the collector of the port of New York, and in which was approved the selection of the Baltic Stores as a place for storage and disinfection of rags, it was provided that where an entry should be presented for rags which had not been disinfected, it should be accepted, but the permit to land should be coupled with the condition that the rags be taken to the proper storehouse for disinfection, and only be delivered therefrom upon a further permit issued by the collector upon the certificate of the inspector in charge of the store that the requirements of the circular had been complied with. Following this and on January fourteenth, the collector by his order directed that on entry of old rags shipped on and after the first of that month, and which had not been disinfected prior to importation, the permit would have written on the face of it directions to the inspector to send the rags to the Baltic Stores by bonded lighters for disinfection. This is in the main the situation as represented by the regulations, orders and circulars on the 30th of May, 1885, when the ship Vigilant, with the rags from Hiogo, Japan, arrived. And a permit or pass was issued by the deputy health officer giving the vessel permission to proceed, but preceding the words of permission, and opposite " Cargo General " were the words " rags excepted." This, as explained by the evidence of the health officer, meant that the vessel be allowed to proceed to the dock and discharge its cargo other than rags. And this is a reasonable interpretation of the permit in that respect. The witness said this was the usual custom at the port in respect to certain articles to expedite delivery to merchants. After the general order of the collector to send to the Baltic Stores all the merchandise, with specific exceptions, on the Vigilant for which no permit had

been received by the inspector on board to the contrary of such direction, had been issued, and on June fifth the collector was instructed by circular from the secretary of the treasury, that as to rags "per Vigilant," which importers claimed were mostly on board before January first, to submit the matter to the health officer and to be governed by him in respect to it. After his attention was called by the collector to this instruction, the health officer concluded a lengthy communication of date June 6, 1885, to the collector as follows: "It seems, therefore, advisable that for the present the rule of disinfection should be general, and that for reasons which have been set forth the rags on the Vigilant should not be an exception to the rule." The collector thereupon and on June ninth directed the inspector in charge of the ship Vigilant (under general order of the June third) to send on bonded lighters to the Baltic Stores all rags for which no permit had been received. This was done and it and what followed in respect to the rags on the Vigilant resulted in the consequences of which the plaintiffs complain.

On June tenth, the health officer made a certificate to the effect that the rags, "per ship Vigilant from Hiogo (Japan), *to be disinfected*, are not from a cholera-infected port." But by it he treats the rags subject to disinfection, in accordance with his letter of the sixth of June to the collector. The secretary of the treasury relieved his department from further responsibility on the subject of disinfection of rags by his circular of June tenth, by which it was ordered that all circulars of the department concerning the disinfection of imported old rags were revoked; and that all of them thereafter imported from foreign countries should be admitted to entry at the custom-house upon the production of permits from the health officers at the port of importation, duly authorizing the landing of them; and that vessels carrying old rags would be detained by the quarantine officers and held subject to the order of the proper health authorities at the port of destination. And two days later, by another circular of the secretary of the treasury, the collector was directed to notify the proprietors of warehouses

where disinfection had theretofore been effected under his (collector's) supervision, that the disinfection of old rags was under the exclusive jurisdiction of the health officer, and must be done at such places as he might designate; and that the designation of their warehouse for such purpose was revoked. By another circular of the secretary of the treasury to the collector, of June eleventh, referring to the desire of the consignees of the rags per Vigilant to be governed by the circular of the tenth, he advised that the department had no objection to this with the understanding that all the facts be first submitted to the health officer. It seems that pursuant to the pre-existing regulations on the subject, the disinfection at the Baltic Stores of the rags taken from the Vigilant was certified by the United States inspector of rags in charge of the warehouse.

The rags imported in the Battaglia were, on or about the nineteenth of June, taken by lighters to Robbins Reef, a place in quarantine designated by the health officer for disinfection. The specific reference made to the regulations, orders and directions of the health officer and treasury department and the execution of them directed by the collector sufficiently show the manner the authority was given, assumed and exercised in taking the possession of the rags for the purposes there indicated. And whatever the secretary of the treasury, and through him the collector, was lawfully permitted to do in that respect, was in aid of the health officer and in observance of the health laws of the state. The direction of the collector that the rags be sent to the places where they were taken from the vessels, was pursuant to the regulation or requirement that they should be disinfected, and it may be said to have been given pursuant to direction from the secretary of the treasury and in aid of the health officer in the execution of his official power by the observance of the regulations made by him in that behalf. And although these rags came within the rule or regulation adopted by him for disinfection, and by his approval and advice were sent to the place where they were taken for that purpose, he testified that

he never gave any order for the disinfection of the rags on either of the two vessels.  While his regulations provided that it be done, and for that purpose the transfer of the rags from the vessels to the warehouses was necessary, it does not appear that he employed anybody to do it.  And so far as appears the work of disinfection was not conducted under the supervision or control of the health officer, nor pursuant to his employment of the disinfecting company which owned the machine by which it was done, or of E. B. Bartlett & Co., who under an arrangement with the company operated the machine in performance of the work.  The goods were sent to the warehouse apparently for the purpose of disinfection, and they assumed to do it without any employment or direction of the health officer, and did it without any approval by him of the efficiency of the work or of the charges resulting from it.  This method of creating charges against imported goods is not fairly within the purpose and meaning of the statute, which provides: "Whenever any expense shall be incurred by the health officer, or whenever any services shall be rendered by him or his employes in the discharge of the duties imposed upon him by law in relation to vessels, merchandise, baggage, dunnage," etc., "under quarantine such expenses and services shall be paid for to the health officer by the master of the vessels," etc. (L. 1865, ch. 592, § 6); and such expenses, services and charges shall be a lien on the vessels, merchandise and other property in relation to which they shall have been made or such services of the health officer shall have been rendered.  (Id. § 7.)  The difficulty with the claim for disinfection is that the company or persons doing it had no direction of the health officer for that purpose, nor was it done by his employes.  The statute contemplates that charges of this character shall be incurred only by means of the official action or in executing the orders of the health officer and be subject to his control through those whom he may employ to perform the services.  His official sanction and responsibility were essential to the creation *in invitum* of charges upon the property of the plaintiffs.  Those for the alleged service of

disinfection seem not to have had such support; and, there-fore, were not a lien upon the rags. But this difficulty is not necessarily applicable to the charges for lighterage and storage. The Baltic Stores had, under the advice and approval of the health officer of the port of New York and the health com-missioner of Brooklyn, been selected and designated by the secretary of the treasury as a warehouse for the storage and disinfection of imported rags. And Robbins Reef had also been duly designated as another place for disinfection of like goods. The collector, under his authority, in view of the regulation for disinfection of the rags on the two vessels adopted by the health officer, was justified in directing as he did the sending of the rags to those places, and the expenses of such transfer were presumptively a lien upon the property to which they related. No specific order or direction of the health officer is essential for that purpose. It is sufficient that it was done pursuant to regulations, within his power, made by him. Of course, if the transfer of the rags to those places for any purpose was caused by collusion or conspiracy between the health officer and Bartlett & Co., no lien in behalf of the latter could result for the charges and storage. But while that was charged in the complaint, it was not supported by the verdict taken against the appellants alone, and is entitled to no consideration in the case as now presented. The question is solely one of power and authority upon the assumption that the health officer acted in good faith, which has the support of presumption since the jury failed to find a verdict against the defendants upon that issue. In view of what has already been observed, that which was done by way of transfer of the rags from the vessels to the selected and designated warehouses for the purposes contemplated, was within the power of the health officer and in aid of the exercise of which the direction of the collector to make the transfer may have been legitimately given and executed, and as the case is now presented it must be so treated. It follows that the charges for lighterage paid by Bartlett & Co., according to the custom in such cases, and for the storage in their Baltic Stores for the time the goods

properly remained there, were a lien upon the rags. But so far as the defendants required the payment of the further claim for disinfection as a condition of the delivery, they were chargeable with duress of property. The right to recover those two items of the bill and each of them is challenged by exceptions taken. It is unnecessary to consider the question whether or not the defendants were entitled to the full amount charged for storage, as there is no basis furnished by the evidence to sever it.

It is urged that there was no verdict effectual to support the judgment, because it was found only against the defendants other than Smith and none as to him was rendered by the jury.

The action was in tort. The charge of conspiracy in the complaint was not necessarily the controlling element of its nature, and it did not require a verdict for or against all of the defendants jointly upon the cause of action there alleged. The defendant Smith was not chargeable with the act of refusal to deliver the property to the plaintiffs, nor did he receive any of the money paid by them to obtain the possession of the rags. His alleged liability was founded upon the charge of conspiracy and collusion with the other defendants for the purpose of enabling them to create the charges and assert the lien to the prejudices of the plaintiffs. And as the plaintiffs consented to and did accept the verdict against those defendants, it is difficult to see any further support for the action against the defendant Smith while the recovery on the verdict remains effectual. In *Porter* v. *Mount* (45 Barb. 422), the cause of action, as alleged in the complaint, was upon a joint contract of the defendants, which denies to that case any necessary application to the present case. The money was paid by the plaintiffs to the defendants upon bills in favor of E. B. Bartlett & Co., who refused to deliver the possession of the rags to the plaintiffs until payment was made. All the members of that firm were for the purposes of the relief equally chargeable to the plaintiffs. These views lead to the conclusion that the judgment should be reversed and a new trial granted, costs to abide the event, unless the plaintiffs

stipulate to reduce the recovery of damages to three thousand one hundred and eighty-two dollars and fifty cents, and in that event the judgment be so modified and, as modified, affirmed, without costs in this court to either party.

All concur, except Potter and Vann, JJ., not voting.

Judgment accordingly.