Syllabus.

## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## RICHMOND LEATHER MANUFACTURING COMPANY V. F. J. FAWCETT.

### June 23, 1921.

### Absent, Prentis, J.

1. SALES—*Action by Purchaser for Breach of Contract—Evidence as to Damages—Resale.*—In an action by a purchaser of shoe laces for breach of contract, evidence as to a contract of resale for the laces covered by an order, which was discharged in full, was immaterial, and evidence as to contracts of resale made by the purchaser for laces covered by orders that were not filled by the seller was proper.

2. SALES—*Action by Purchaser for Breach of Contract—Evidence as to Damages—Resale.*—In the instant case, an action by purchaser for breach of contract of sale of shoe laces, purchaser was entitled to show that he had contracts for resale of these laces, and the terms of these contracts, as evidencing the damages he had suffered by the defendant's failure to complete his deliveries. The defendant was aware that the purchases were made for resales. It was not entitled to be apprised of the details of these contracts of resale, the persons with whom they were made, and the terms of such resale, at the time that it made its contracts with the plaintiff, unless these resales had been for exceptional and unusual profits.

3. SALES—*Action by Purchaser for Breach of Contract—Evidence as to Damages—Market Value.*—In an action by a purchaser for breach of contract of sale of shoe laces, plaintiff had the right to prove the market price of the undelivered laces at the place of delivery. If he was entitled in law to recover from the defendant, then the difference between the defendant's price to the plaintiff and the price at which the laces could have been resold on the market at the place of delivery, if delivered in due course, represented the plaintiff's damages.

4. SALES—*Cancellation by Buyer—Instructions—Question for Jury.*—In an action for damages by a purchaser of shoe laces for seller's refusal to deliver according to contract, the court

instructed the jury that if they believed from the evidence that the defendant agreed to fill plaintiff's orders at the rate of 50,000 a week, beginning at a certain date, and thereafter failed to make deliveries as agreed, plaintiff was justified in canceling the orders, and the jury should find for the plaintiff, and assess his damages in conformity with the directions of the court.

*Held:* No error, as there was evidence supporting plaintiff's contention and if there was evidence to the contrary, the resolution of the conflict was proper matter for the jury.

5. SALES—*Action by Buyer for Breach of Contract—Instructions.*—In an action by a buyer of shoe laces against purchaser for failure to make deliveries in accordance with the contract of sale, the court instructed the jury that whatever they ascertained to be the contract between the parties relating to delivery, the defendant was bound to deliver according to the terms of such contract, and, if it failed to do so, it was liable in damages to the plaintiff.

*Held:* That this instruction was proper, and a correct pronouncement of the law.

6. SALES—*Action by Buyer for Breach of Contract—Instructions—Rush Order.*—In an action by a buyer of shoe laces against purchaser for failure to make deliveries in accordance with the contract, the court instructed the jury that if they believed from the evidence that the defendant accepted an order for shoe laces stipulating "delivery to be rushed," with knowledge that such laces were being purchased for resale for army use, then the provision as to delivery required rather more than that such laces should be sent within a reasonable time, and required delivery by the defendant without any delay, except such as might be absolutely necessary in the usual course of defendant's business.

*Held:* That this instruction accords with reason, and is supported by authority.

7. SALES—*Delivery—Time as Essence of Contract—Waiver of Rights by Buyer.*—Ordinarily, with respect to contracts for the sale and delivery of manufactured articles, time is not of the essence, but when by contract one is entitled to deliveries in an agreed amount at a specified time, he is not compelled to accept a substituted performance. He has ample legal defense, but if he does not stand upon his rights, and accepts such performance and pays for same, a new status or relationship between the parties is created, and the buyer loses a measure of his rights by his voluntary action in this respect.

8. WAIVER—*Estoppel—When Waiver Applies.*—Waiver applies to any right conferred by law or contract. . This right may or may not be exercised by the person holding it. Being for his own benefit, no one is concerned in its relinquishment save himself. Hence the owner of such right may waive it expressly, either in writing or by parol, and impliedly by inconsistent conduct; that is to say, a covenantor may by his conduct so lull his covenantee into security as thereby to estop himself from the exercise of a right for which he had contracted.

9. WAIVER—*Consideration.*—An actual waiver is a completed performance. It is doing what one wills with his own. Hence there is no question of consideration involved.

10. WAIVER—*Agreement to Waive—Actual Waiver.*—An agreement to waive and an actual waiver are essentially different.

11. SALES—*Rescission—Waiver of Right to Rescind—Delayed Deliveries.*—When a contracting party who is entitled to rescind a contract and sue for damages by reason of the defaults of the other accepts a delayed delivery and pays for same, he cannot rely upon antecedent breaches to support a rescission. If at a later stage of the relations between the parties he wishes to exercise the right of rescission, that right must rest upon a new breach by the other contracting party. A series of dealings in which delayed deliveries are accepted and paid for, and further deliveries demanded, justifies the party in default, in the absence of anything to the contrary, in concluding that the contract will not be rescinded on account of such delayed deliveries without notice. Under such circumstances, rescission without notice on account of delayed delivery would be in derogation of the accustomed course of dealing between the parties.

12. SALES—*Acceptance of Delayed Delivery—Contract of Sale Kept Alive.*—If failure to deliver according to the terms of a contract gives the right to rescind, acceptance of a delayed delivery and payment therefor, standing alone, is a waiver of the right and an election to hold the defaulting party to his contract. By his waiver the party entitled to rescission keeps the contract alive against the party in default, but he also keeps it alive in his favor and against himself, and neither can sue save for a breach thereafter occurring. This revival, so to say, of the contract, enables the party in default not only to complete the contract, if so advised, notwithstanding the previous default, but also to take advantage of any supervening circumstances which would justify him in declining to complete.

13. SALES—*Breach of Contract—Remedy—Rescission.*—A legal alternative is presented to a buyer entitled to rescind for a breach of contract by seller as to date 'of delivery. He can stand·upon his legal rights, treat the contract as ended, and bring action for damages against the party in default; or he can accept the delayed delivery, pay for same, and thereby keep the contract alive, alike for himself and his adversary.

14. SALES—*Breach of Contract by Seller—Waiver—Instructions— Case at Bar.*—In the instant case the question to be determined was whether plaintiff, purchaser of shoe laces under a contract of sale, was entitled to terminate deliveries without notice to the seller, or whether, as a result of his dealings with the seller by accepting and paying for many delayed deliveries, he was required to give notice to the seller that thereafter he stood upon his legal rights, and the contracts must be discharged strictly according to their terms. The court instructed the jury fully and accurately as to the rights of the plaintiff under the original contracts, unmodified and unaffected by the course of dealing between the parties, but these instructions wholly ignored the evidence tending to show a waiver by plaintiff through his acceptance of the delayed deliveries.

*Held:* That an instruction should have been given defining waiver, how effected, and its consequences, and instructing the jury as to their duty should they determine from the evidence that a waiver had actually taken place.

15. RELEASE—*Validity of Contract Not to Sue—Sales—Evidence to Show Waiver by Buyer of Breach by Seller—Case at Bar.*— A seller repeatedly breached the contract of sale by failure to make deliveries at the times agreed. Upon demand by the purchaser for prompt deliveries in accordance with the contract, seller testified that he told purchaser that if he intended to sue him for breach "we must stop right here and meet the issue," and purchaser then told seller to continue shipments and there would not be any law suit, and the shipments continued.

*Held:* That while this alleged contract not to sue was not an enforceable undertaking, yet all that passed in that connection between the seller and buyer was proper for the consideration of the jury in the determination of whether buyer had waived his right to rescind for default in delivery.

Error to a judgment of the Circuit Court of the city of Richmond in a proceeding by motion for a judgment for damages. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Scott & Buchanan* and *D. H. Leake,* for the plaintiff in error.

*Munford, Hunton, Williams & Anderson,* for the defendant in error.

SAUNDERS, J., delivered the opinion of the court.

This is a proceeding in the form of a motion for a judgment on the part of Frederick J. Fawcett, a commission merchant and jobber of the city of Boston, against the Richmond Leather Manufacturing Company, a concern making rawhide shoe laces and other leather products in Richmond, Virginia. The action is to recover damages alleged to have been suffered by the plaintiff by reason of the alleged defaults of the defendant in respect of the delivery of certain rawhide shoe laces to the plaintiff, pursuant to contracts between the parties.

There are four orders in controversy. These orders were given by Fawcett to the defendant as follows:

Order No. 4026, of July 14, 1917.
Order No. 4033, of July 16, 1917.
Order No. 4092, of August 3, 1917.
Order No. 4194, of August 31, 1917.

There was a prior order, but deliveries under the same were completed, and while it is referred to in aid of the ascertainment of the precise contract between the parties with respect to orders 4026 and 4033, it is not in issue.

The foregoing orders were the same in form, as will be seen from order No. 4026, which is typical.

"Order.

"Put this number on invoice—4026

"Boston, July 14, 1917.

"Messrs. Richmond Leather Company, Richmond, Va.

"Please deliver to Frederick J. Fawcett, 132 Lincoln street, 58,000 36" 3-16 rawhide laces, $0.78 per hundred feet. Confirmation of wire of even date of which we send you enclosed copy.

"Terms: 2% 60 days, F. O. B. Boston.

"Frederick J. Fawcett."

Order 4026 was for 58,000 36" 3-16 rawhide laces, orders 4033 and 4092 were, respectively, for 116,000 and 200,000 of same, and 4194 was for 500,000 laces, 7-32 30" 1-8.

Plaintiff's claim for damages was for 38,000 laces undelivered on order 4026, 116,000 undelivered on order 4033, 200,000 undelivered on order 4092, and 339,000 undelivered on order 4194.

The jury returned a verdict in favor of the plaintiff in the sum of $3,905.95. This verdict the defendant moved to set aside on various grounds, but the court overruled the motion. Thereupon, the defendant applied for and secured a writ of error to the judgment of the trial court.

The plaintiff in error assigns as error the action of the trial court in various particulars.

I. "In not sustaining the demurrer to the notice, and motion to quash the same." This assignment is not insisted upon, and further it does not seem to be well taken.

II. "In admitting the testimony of the plaintiff, Faw-cett, as to certain correspondence between the said Faw-cett and the defendant company, prior to the making of the contracts sued upon."

The admission of this testimony was not error.

III. "In permitting the plaintiff to introduce a letter of Geo. F. Smith, of the committee on supplies of the War Industries Board, Council of National Defense."

This letter was properly admitted.

[1-2] IV. "In admitting the testimony of the plaintiff (a) as to the contracts made by him for the laces purchased by him from the defendant covered by orders 4020, 4026, 4023 and 4194, for the reason that as to the orders involved pe-titioner had no notice of such sub-contracts, and (b) as to the market price in Boston of the laces covered by order 4092, and which plaintiff testified could have been resold at a profit, for the reason that this contract had been can-celled (along with all the other contracts) by the plaintiff himself."

The evidence as to the contract of re-sale for the laces covered by order 4020, which was discharged in full, was immaterial. The evidence as to the contracts of resale made by Fawcett for the laces covered by orders 4026, 4023 and 4194 was proper. Fawcett was entitled to show that he had contracts for resale of these laces, and the terms of these contracts, as evidencing the damages he had suffered by the defendant's failure to complete his deliveries. The de-fendant was aware that the purchases were made for re-sales. It was not entitled to be apprised of the details of these contracts of resale, the persons with whom they were made, and the terms of such resale, at the time that it made its contracts with the plaintiff, unless these resales had been for exceptional and unusual profits. This does not appear to have been the case in reference to the market price of laces in Boston. Hence, it was in no wise material

to the defendant in discharging its duty of making delivery pursuant to its contracts, to know the names of the plaintiff's contractees, and the terms of resale. See *Perry Tie Co.* v. *Reynolds*, 100 Va. 272, 40 S. E. 919. For the purpose of establishing his damages, the plaintiff was entitled to show that he had definite contracts of resale for the undelivered laces, and the terms thereof.

[3] With respect to the undelivered laces covered by order 4092, the plaintiff had the right to prove the market price of such laces in Boston. If he was entitled in law to recover from the defendant, then the difference between the defendant's price to the plaintiff and the price at which the laces could have been resold on the Boston market, if delivered in due course, represented the plaintiff's damages.

V. "In giving the instructions asked for by the plaintiff, any or either of them."

VI. "In refusing to give instructions asked for by your petitioner, or any of them."

VII. "In refusing to modify the instructions given for the plaintiff, one to four, any, or either of them, by adding thereto the following clause: 'Unless the jury shall believe from the evidence that the plaintiff by his conduct or course of dealings waived his right to demand deliveries as called for in the contract.'"

VIII. "In refusing to set aside the verdict of the jury and award a new trial on account of various errors assigned, and because the verdict was contrary to the law and the evidence."

Assignments 5, 6, 7 and 8 raise questions which we will now proceed to consider.

A material ground of defense relied upon by the defendant is that whatever may have been its defaults, in respect of delivery, "the plaintiff had waived the strict performance of the contracts, as to deliveries (regardless of what

the contracts may have been), both expressly and by his conduct and course of dealings, and by repeatedly accepting deliveries after the times, according to the claim of the plaintiff, deliveries were called for by the contracts;" and that "following such waiver the defendant was proceeding to make deliveries, and was ready to complete his contracts when, without notice, the plaintiff refused to accept any further deliveries under the contracts."

[4] There is a conflict between the parties relating to the terms of delivery under orders 4020, 4026 and 4033. The plaintiff contends that the contract of the defendant was to deliver laces in reasonable amounts, and within a reasonable time after acceptance of said orders. The court, by instruction three, properly remitted to the jury the determination of the terms of the contracts actually made, instructing them in that connection that if they believed from the evidence that the defendant agreed to fill the orders, *supra,* at the rate of 50,000 a week, beginning August 1, 1917, and thereafter failed to make deliveries as agreed, the plaintiff was justified in cancelling said orders, and the jury should find for the plaintiff, and assess his damages in conformity with the directions of the court. There was no error in this instruction. We find in the record evidence supporting the plaintiff's contention, and if there is evidence to the contrary, the resolution of this conflict was proper matter for the jury.

[5-6] The court also, in substance, instructed the jury, by instruction one, that whatever they ascertained to be the contract between the parties relating to delivery, the defendant was bound to deliver according to the terms of such contract, and if it failed to do so, it was liable in damages to the plaintiffs. This instruction was likewise proper, and a correct pronouncement of the law. The terms of orders 4092 and 4194, with respect to delivery, were specific. Order 4092 was for 200,000 3/16 36" rawhide laces at $0.82

per hundred feet, to be up to government requirements, and delivery to be rushed. With respect to this order, the court instructed the jury that if they believed from the evidence that the defendant accepted same stipulating "delivery to be rushed," with knowledge that such laces were being purchased for resale for army use, then the provision as to delivery required rather more than that such laces should be sent within a reasonable time, and required delivery by the defendant without any delay, except such as might be absolutely necessary in the usual course of defendant's business. This instruction accords with reason, and is supported by authority. See *Robinson* v. *American Locomotive Co.*, 56 Misc. Rep. 589, 107 N. Y. Supp. 69, 71; *Tobias* v. *Lissberger*, 105 N. Y. 404, 12 N. E. 13, 59 Am. Rep. 509; *Duncan* v. *Topham*, 8 C. B. 225, all to the same effect.

In *Robinson* v. *American Locomotive Co.*, *supra*, the court said, at p. 591 of 56 Misc. Rep., at p. 71 of 107 N. Y. Supp.: "The requirement of defendant that the shipment should be 'the earliest possible,' must be construed as meaning that the goods should be sent as soon as plaintiff could possibly send them, and signified rather more than that the goods should be sent within a reasonable time. It was what may be called "a hurry order."

Delivery of the laces covered by order 4194 was to begin at once, and continue until completion, at a minimum rate of 25,000 a week.

The instructions given by the court seem *per se* to have been correct. The defendant was behind in deliveries from the very beginning of its contracts. In its first letter to Fawcett, seeking a contract, of date May 28, 1917, it wrote that if it could secure a contract, shipments could begin "right after receipt of the order, and continue at the approximate rate of 30,000 a day." Later, after some tentative telegrams between it and Fawcett, relating to an order for laces which was subsequently fixed at 200,000, it wrote

on July 12, 1917, as follows: "Replying, etc. If you secure this order, we will ship 50,000 per week, beginning after August 1st," etc. Having secured the four orders, the defendant delivered in the aggregate fifty thousand laces in August and forty-one thousand laces in September.

On July 16, the plaintiff wrote the defendant, in part, as follows: "From your wires and telegrams, we understand that you will begin shipping us 50,000 laces per week, beginning August 1st, and will continue to ship at that rate, or better, if possible, until our orders are completed. * * * It is very important that you should keep up these deliveries, as these goods are for army shoes, and we must be able to fulfil our contract." On August 3rd, the plaintiff wrote to the Leather Company, in part, as follows: "It is absolutely necessary that you should begin deliveries at once on our orders, of at least 75,000, or 100,000 per week. If you have not already made us a shipment, will you kindly make us an express shipment of 25,000, and advise us just how many per week you are going to ship, and by what way."

From this time forward, the plaintiff continued to press his demands for better deliveries with increasing insistence. He refers time and again to defendant's letter, and later to its personal assurance, touching a delivery of 50,000 laces a week, and "better if possible." These references are found in the plaintiff's letters of August 10, August 21 and August 27, and in other letters later. On August 31, plaintiff placed the order for 500,000 7/32-30" ⅛ laces to be shipped at the rate of at least 25,000 a week. Complaint with respect to delay in deliveries under this order began as early as September 7, 1917. In addition to his letters, plaintiff made various trips to Richmond to see defendant in person, and urge expedited delivery. The defendant's response to this stream of complaints by letter and telegram, was a series of explanations and assurances of better service. At no time does it appear to have denied the plain-

tiff's assertions with respect to the specific deliveries to which he maintained that he was entitled. At one time the cause of delay is laid at the door of labor troubles, at another time to difficulty in procuring materials, and at still another to transportation difficulties, one explanation following another in monotonous iteration. Nevertheless, the plaintiff did not treat the defendant's delayed deliveries as breaches of the contract entitling him to refuse to accept such deliveries and bring his action for damages. During the months of August, September, October, November, December and a part of January, he accepted these deliveries, and paid for same, without ceasing, however, to insist upon expedited service.

On December 11, 1917, Mr. Gay, of counsel for plaintiff, wrote to the Leather Company, confirming his conversation of even date with Mr. Lyons, secretary of said company, directing it to discontinue further shipments under the orders for 36" 3/16 rawhide laces. Further shipments were made thereafter, received and paid for, of 7/32 x 30 laces. On February 14, 1918, Mr. Gay, as per instructions of his client of even date, wrote to the Leather Company, notifying it that Fawcett would not accept further shipments of laces "in view of the continued default of the company in complying with its agreement with respect to delivery." The company was advised in the same letter that Fawcett's action was without prejudice to his rights to hold it responsible for its failure to comply in all respects with the terms of its contract.

Prior to the letter of February 14, *supra*, the Leather Company had written two letters to Fawcett of date February 9, 1918. In the first letter, among other things, it said: "We do not want to hurry you, but we will have to ask you to let us hear from you in regard to the 3/16 by 36 inch and the 7/32 by 30 inch due you, or else the

orders will have to be automatically cancelled, because the first thing that we know, you will have ordered the laces out, and we will not have a hide in the vats suitable for that purpose, or you may write us to cancel, and we will have the laces here ready to ship.  Therefore, we positively must know something either way by return mail, or, as we said above, we will have to consider your orders automatically cancelled, and any further business will be taken up on an entirely different basis.  * * *  We will be prepared to produce just four times our former output."

This second letter concludes with this sentence:  "With kind regards, and again asking you to let us hear from you as to cancelling or shipping the balance of your order."

Prior to the foregoing letters, the plaintiff and Lyons had an interview on November 3, 1917, in the office of the latter, relating to delivery and other matters.  Lyons gives this account of the conclusion of the interview:  "I said, 'Mr. Fawcett, let me understand you, if you have any idea of bringing a suit for damages, we must stop right here, and meet the issue.  I will meet the issue right where it is, before I ship you any more laces, if you have any law suit in view,' and he said, 'Well you are going to do better for me, aren't you?' I laughed and said, 'Mr. Fawcett, I think I can do better for you, because the leather is in sight now for the two or three months' supply.' It was in process—it akes about fifty days in process—and I said, 'I have got nearly two months' supply of leather suitable for your purposes in process; but,' I repeated, 'I cannot ship you any more if there is going to be any suit; I would rather meet the issue now than get deeper into it.'  And he then agreed that he would not sue, but we were to go along, and ship him some more, and I went along and shipped him faster than before.  I shipped him almost daily during November and December, not daily, but frequently each week.  But I said to him, 'If

there is going to be any law suit, let us stop and meet the issue now.'

"Q. And he said there would not be any?

"A. He told me to continue shipments, and there would not be any law suit.

"Q. Did you then act on the understanding you had?

"A. Yes, the understanding was entirely satisfactory to me, and our relations were as cordial as they ever had been. I never had the slightest idea of a law suit, not the most remote.

"Q. You continued the shipments up to the time shown on the paper?

"A. Yes, sir.

"Q. And I think you ceased to make shipments because of the request contained in some letter, or telegram?

"A. Yes, sir, not to ship any more."

In respect to the foregoing statement of an agreement, Mr. Fawcett, when recalled, stated: "I don't remember distinctly what did happen (i. e., between him and Mr. Lyons); I know I never did in any manner, shape, or form, waive any order." He states further that the object of his trip to Richmond "was to impress upon Mr. Lyons the great need of getting more laces, and keeping up to what he promised on the orders."

On January 28, 1918, subsequent to the foregoing interview and prior to the letters of February 9, the Leather Company wrote Fawcett as follows:

"We wrote you several days ago that we had an especially nice lot of leather coming through, suitable for 7/32 shoe laces and can ship you 10,000 per day, and asking you how many we should ship, but have had no reply. If you desire us to ship any more of these laces, please wire us on receipt of this how many you desire, and we will ship 10,000 a day. Please wire us, and oblige."

"Q.   Were you able to comply with your proposition thereafter?

"A.   Yes, sir, because leather was running good for this purpose after that.

"Q.   Did you get any reply to that letter?

. "A.   No. sir."

Subsequent to the interview of November 3, and the letter of December 11, the Leather Company made a number of deliveries of 7/32 laces.

From the foregoing citations from the record, and many others that might be made, it very clearly appears that the plaintiff time and again accepted and paid for deliveries that he might have refused, though all the while insisting upon better deliveries. This acceptance of delayed deliveries continued to January 21, 1918.

[7] What was the effect upon the plaintiff's rights of this action on his part? Ordinarily, with respect to contracts for the sale and delivery of manufactured articles, time is not of the essence, but when by contract one is entitled to deliveries in an agreed amount at a specified time, he is not compelled to accept a substituted performance. He has an ample legal defense, but if he does not stand upon his rights, and accepts such performance and pays for same, a new status, or relationship, between the parties is created, and the buyer loses a measure of his rights by his voluntary action in this respect.

In *Reid* v. *Field,* 83 Va. 26, 1 S. E. 395, the defendant, Field, contracted with the plaintiff, Reid, for ten tons of fertilizer to be delivered promptly on or before September 22, 1880, for use in seeding the former's wheat. Prompt delivery was delayed by the fertilizer company, but was accepted by the defendant, who gave his note therefor five or six weeks after September 22—that is to say, five or six weeks after the alleged breach of the contract. When sued upon this note, the defendant set up in a special plea the defense

that the defendant had failed to deliver the fertilizer conformably to his contract, in time for early seeding, whereby he had been damaged in the sum of $500, a sum exceeding the amount of the note sued upon. Speaking of this plea, the court said: "The defendant, by his plea, virtually admitted that, though he once had a complete defense, he had waived it by accepting from the plaintiff a substituted performance, and by executing his note after the alleged breach. * * * The plaintiff had the right to have performance on the part of the seller according to the very terms of the contract. * * * But instead of standing firmly on his ample legal defense, the defendant in error waived it, by accepting a substituted performance, and by his subsequent promise, and the suit was brought, not on the original executory contract, but on the subsequent promise—the executed contract." The court cites approvingly, Benjamin on Sales, with respect to waiver: "No authority is needed," says Mr. Benjamin, "for the proposition that the party in whose favor a condition has been imposed can expressly waive it." Benjamin on Sales, sec. 566. Hence, says the court, "it is a recognized principle that every one may waive a right intended for his own benefit, if it can be relinquished without detriment to the community at large."

To the above effect the court also cites Hare on Contracts: "Waiver is a renunciation of some rule which invalidates a contract, but which having been introduced for the benefit of the contracting party, may be dispensed with at his pleasure." Hare, 272.

Concluding, the court said: "In this case, the defendant in error, after the alleged breach of the original agreement by the plaintiff in error (Reid), by accepting a substituted performance, and by his subsequent promise, waived the protection given by law, and relinquished his right to rely upon the rule provided for his protection." *Id.*, 83 Va. p. 33, 1 S. E. 400.

In the case, *supra,* the defendant was under no compulsion to accept a substituted performance, but having accepted it, and paid for same, his own voluntary action effected a waiver of a benefit for which he had stipulated, and to which he was entitled. This was not a contract to waive, but an actual waiver. The distinction between the two will be discussed later.

In the case of *Miller & Co.* v. *Lyons,* 113 Va. 275, 74 S. E. 194, it appears that one Lyons, during a series of years, was the purchaser, upon margins, of stocks through the firm of Miller & Co., stockbrokers. The contract between the parties was as follows: "It is understood that on all marginal business, we (*i. e.,* Miller & Co.) reserve the right to close transactions for your account, without further notice, whenever your margins are running out, and to settle contracts in accordance with the rules and customs of the New York Stock Exchange." Upon the purchase of stocks on Lyons' account, Miller & Co. would issue to Lyons a receipt containing, among other provisions, the following: "If the said Miller & Co. shall at any time, for any reason, deem the said margin insufficient, then the said Miller & Co. may close any, or all, of such transactions without demanding further payment, or additional security, * * * and may sell any securities held as collateral on the New York Stock Exchange, etc., or elsewhere, at public or private sale, without demand or notice." Miller & Co., on July 26, 1910, sold certain stock of the plaintiff on a declining market, without notice to said plaintiff. Thereupon, Lyons brought an action for damages against the firm, and secured a verdict for $7,145.00. The contention of Lyons was that during a course of dealing of more than four years between him and Miller & Co., the latter had not exercised, or claimed, the right to close transactions without notice to him, and an opportunity to deposit further margins, and hence was

estopped thereby from closing the customer's transactions contrary to such customary course of dealing. Commenting on the evidence relating to the above contention, this court said: "Lyons had been dealing with Miller & Co. during a long period, through their accredited agent Roden. These dealings, while directly with Roden, appear always to have been communicated to, and approved by, his principals. By that course of dealings Lyons had been led to believe that a sale would not be made without giving him due notice." The court held in this case that the broker's right to close transactions without further notice, whenever margins were running out, could be waived by the broker, either in express terms, or by a course of dealing giving the customer the right to believe that his transactions would not be closed under such authority without notice.

Further, the court said, citing *Bower* v. *McCormick*, 64 Va. (23 Gratt.) 310: "That covenants and stipulations made by a covenantor for his benefit may be waived by him, either by express terms or by a course of dealing, is a well-established principle in every system of enlightened jurisprudence. That a covenantor by his conduct may so lull his covenantee into a sense of security as thereby to estop himself from the exercise of a right for which he had contracted, is equally clear. Instances illustrating this principle abound in the law with reference to contracts of insurance, but its operation is not limited to any specific class of contracts, and dealings between men. Such estoppels are founded upon principles of morality and public policy; their object being to prevent that which deals in duplicity and inconsistency."

The trial court in the case cited *ubi supra,* instructed the jury fully as to waiver of right by express agreement, or by a course of dealing, and these instructions were approved by the court. The plaintiff in this case, like the de-

fendant in the case in judgment, relied both upon the general course of dealing between the parties, and a specific contract. Moreover, in the case cited, it was fully conceded by the court that Miller & Co. had the right to sell Lyons' stocks whenever his margin fell below ten points, and that they were the sole judges of the necessity and propriety of sale, but, as the court added: "It is plain that the evidence in the record does tend to establish such a course of dealing as tended to lull Lyons into a false sense of security, and such as to induce a reasonable man to believe that the power of sale would not be exercised, without an opportunity on his part to put up additional margin. Running through the whole course of their transactions, covering about four years, there were many instances in which Lyons' margin fell below ten per cent."

The case of *Norfolk Hosiery Co.* v. *Aetna Hosiery Co.*, 124 Va. 221, 98 S. E. 43, was an action for damages for the failure of the Norfolk Hosiery Co. (the defendant) to take certain goods ordered from the plaintiff (the Aetna Co.). The question of waiver arose in this case by reason of the conduct of the defendant. The defendant claimed that the plaintiff was bound to begin deliveries on February 1, 1915, and that its failure to carry out the contract in this respect gave it (the defendant) the right to rescind. There was evidence in the case tending to show a waiver of this provision of the contract. The defendant assigned as error the action of the trial court refusing to give an instruction which, in substance, told the jury that if the plaintiff was bound to begin delivery on February 1, 1915, and it failed to do so, and such failure continued to February 23, the defendant had the right thereupon to notify the plaintiff not to ship any goods thereafter, and such action on its part did not constitute a breach of the contract. Neither this instruction, nor any other in the case, dealt with the subject of waiver.

The court held that time was of the essence of the contract under consideration, but that there "was no reason why one party who had a right to rescind because of the breach by the other, may not waive that right, and hold the other party to performance. The law on this subject is well settled. Conceding that the contract bound the plaintiff to begin deliveries on February 1, 1915, the instruction wholly ignored the evidence tending to show a waiver of this provision of the contract, and left the jury free to find for the defendants on this question, notwithstanding such waiver." *Id.*, 124 Va. 235, 98 S. E. 47. Speaking of the letter of the defendant to the plaintiff, of date February 23, 1915, and stated by the former to be a shipping direction, and not intended to terminate the contract, the court said: "If this be true, then the contract continued in force, and if the failure of the plaintiff to make deliveries between February 1 and February 23 gave the defendant the right to rescind, it waived the right, and elected to hold the plaintiff to its contract. The defendants were within their rights in doing this, but when they kept the contract alive against the plaintiff, they kept it alive also in favor and against themselves, and neither could sue the other save for a breach thereafter occurring." *Id.*, 124 Va. 237, 98 S. E. 47.

In support of the foregoing propositions, the court cited *Frost* v. *Knight*, L. R. 7 Ex. 111, and *Bernstein* v. *Mesch*, 130 N. Y. 352, 358, 29 N. E. 255, 256. In *Frost* v. *Knight* the court said: "The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of non-performance; but in that case he keeps the contract alive for the benefit of the other party, as well as his own; he remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it,

but also to take advantage of any supervening circumstances which would justify him in declining to complete it." The evidence for the plaintiff (the Aetna Company) was that from February 24, 1915, forward, it was ready, able and willing to carry out the contract. The court had no difficulty in concluding that the defendant waived whatever right of rescission it had for failure of the plaintiff to make deliveries prior to February 23, 1915.

The case of *Eichelbaum* v. *Klaff*, 125 Va. 98, 99 S. E. 721, was a controversy arising under a written contract between the parties by which Klaff, the defendant, undertook to deliver 1,000 tons of scrap iron to Eichelbaum in from ninety to 100 days. This undertaking Klaff failed to carry out. Thereupon Eichelbaum brought his action for breach of contract. The defense set up was that the plaintiff had waived his right with respect to the time of delivery, and that following such waiver the defendant was proceeding to make deliveries when, without notice, the plaintiff refused to accept further deliveries. The issue of fact was submitted to the jury, which found in favor of the defendant. The plaintiff brought error. This court held that as a general proposition in contracts for the delivery of goods, time is not of the essence, and further that when by contract delivery is made imperative by a certain date, "the vendee may waive it expressly, either in writing, or by parol, and impliedly by inconsistent conduct."

The court approvingly cited the following definition of waiver from Bishop on Contracts, section 72: "Waiver is where one in the possession of any right, whether conferred by law or contract, and with full knowledge of the material facts, does or forbears the doing of something inconsistent with the existence of the right, or of his intention to rely upon it; thereupon he is said to have waived it, and he is precluded from claiming anything by reason of it afterward."

It appears in the opinion that the plaintiff wrote the defendant a letter in which he notified him that unless deliveries were completed by the 20th or 23rd of July, he would cancel the contract and sue for damages, but thereafter he accepted the delivery of several cars. Proceeding the court said: "After this last waiver, and while the defendant was performing the contract, the plaintiff stopped deliveries in August, by writing a letter * * *. After the receipt of this letter, the defendant wrote several times for further instructions. To these letters there was no satisfactory reply * * *, and on August 17th, plaintiff's attorney wrote defendant that the plaintiff had placed the claim for damages in his hands for attention. Considering this evidence as upon a demurrer to defendant's evidence by the plaintiff, it is clear that he would not be justified in sustaining the demurrer." Id., 125 Va. p. 100, 99 S. E. 722.

[8-11] The principles announced in the Virginia cases cited are very plain, and may be readily applied to the case in judgment. Waiver applies to any right conferred by law or contract. This right may, or may not, be exercised by the person holding it. Being for his benefit, no one is concerned in its relinquishment save himself. Hence the owner of such right, as stated in Eichelbaum v. Klaff, "can waive it expressly either in writing, or by parol, or impliedly by inconsistent conduct"—that is to say, as stated in Miller & Co. v. Lyons, supra, "a covenanter may by his conduct so lull his covenantee into security as thereby to estop himself from the exercise of a right for which he had contracted." An actual waiver is a completed performance. It is doing what one wills with his own. Hence, there is no question of consideration involved. In the case of Reid v. Field, supra, the latter was under no compulsion to accept a substituted performance. Of his own volition he accepted a delayed delivery, and paid for the same, thereby waiving a

right conferred by law: An agreement to waive and an actual waiver are essentially different. A man who is entitled to a specific performance may agree to accept a delayed delivery, and waive his right to rescind the contract, or he may negotiate other terms for performance. According to many authorities, such contracts lack a lawful consideration, and the party holding the right to rescind may decline to accept a delayed delivery, or to comply with the terms agreed upon for substituted performance. See *Lingenfelder* v. *Wainwright Brewing Co.,* 103 Mo. 578, 593-5, 15 S. W. 844; Williston on Contracts, vol. 1, sec. 130, 130-a; *Jenkins* v. *Britten,* 185 Ill. App. 67. But the situation is entirely different when the right is actually waived in any one of the modes recognized by the Virginia authorities. When a contracting party who is entitled to rescind a contract and sue for damages by reason of the defaults of the other, accepts a delayed delivery and pays for same, he cannot rely upon antecedent breaches to support a rescission. If at a later stage of the relations between the parties he wishes to exercise the right of recission, that right must rest upon a new breach by the other contracting party. A series of dealings in which delayed deliveries are accepted and paid for, and further deliveries demanded, justifies the party in default in the absence of anything to the contrary, in concluding that the contract will not be rescinded on account of such delayed deliveries without notice. Under such circumstances, rescission without notice on account of delayed delivery would be in derogation of the accustomed course of dealing between the parties. *Miller* v. *Lyons, supra; Norfolk Hosiery Co.* v. *Aetna Co., supra,* 124 Va. p. 237, 98 S. E. 43.

[12] If failure to deliver according to the terms of a contract gives the right to rescind, acceptance of a delayed delivery and payment therefor, standing alone, is a waiver of the right and an election to hold the defaulting party to his

contract. By his waiver, the party entitled to rescission
keeps the contract alive against the party in default, but
he also keeps it alive in his favor and against himself, and
neither can sue save for a breach thereafter occurring.
*Norfolk Hosiery Co.* v. *Aetna Co., supra,* 124 Va. p. 237, 98
S. E. 43. This revival, so to say, of the contract, enables the
party in default not only to complete the contract, if so ad-
vised, notwithstanding the previous default, but also to take
advantage of any supervening circumstances which would
justify him in declining to complete. *Id.,* 124 Va. p. 237, 98
S. E. 43.

[13] The status effected by the waiver is a voluntary cre-
ation of the party to rescind. A legal alternative is presented
to him. He can stand upon his legal rights, treat the con-
tract as ended, and bring action for damages against the
party in default; or he can accept the delayed delivery,
pay for same, and thereby keep the contract alive, alike for
himself and his adversary. In *Eichelbaum* v. *Klaff, supra,*
the plaintiff after waiving the original date of delivery,
thereafter wrote to the defendant that unless the deliv-
eries were completed by the 20th or 23rd of July, he would
cancel the contract and sue for damages. He waived this
last date by accepting subsequent deliveries. He was not
allowed thereafter to refuse to accept further deliveries,
and terminate the contract without notice. Every case with
respect to the conclusion, or derivation, of waiver from the
dealings of the parties must depend upon its own facts.

[14] Coming now to the case in judgment. The nature of
the plaintiff's claim is set out as follows in the brief of coun-
sel for plaintiff: "It is important to bear in mind through-
out the following discussion that this is not a claim for
damages sustained by reason of delay in deliveries actually
made. On the contrary, the damages sued for and recov-
ered in this action are those sustained by Fawcett through

the failure of the Leather Company to complete deliveries in accordance with the terms of its contract * * *.  As previously stated, this action is for the recovery of damages arising by reason of the Leather Company's failure to deliver these undelivered laces, as called for by the contracts." This statement of the nature of the plaintiff's claim calls attention sharply to the fact that it is of necessity based upon a rescission of the contract. If the plaintiff was not entitled to rescind the contract at the time he undertook to terminate it, then of course he is not entitled to damages for the undelivered laces.  If without legal authority he stopped deliveries under the contracts when the Leather Company was in a position to discharge its obligations, he is not in a position to claim damages for failure to deliver, consequent upon his action.  The very crux, therefore, of this matter is, whether the plaintiff was entitled to terminate deliveries without notice, or whether, as a result of his dealings with the Leather Company, conceding that the latter had been repeatedly in default, he was required to give notice to the latter that thereafter he stood upon his legal rights, and the contracts must be discharged strictly according to their terms. Deliveries on the thirty-six-in. 3/16 laces were ordered discontinued on December 11, 1918. Delayed deliveries on these orders had been received as late as December. Deliveries on the thirty inch laces were made as late as January 21, 1920.  On same date the Leather Company telegraphed Fawcett: "Expressed ten thousand 7/32 laces today, and can express ten thousand per day, as now have leather.  Shall we continue to ship daily? If so, how many must we ship?"  On the stand, Fawcett testified that as late as February 14, 1918, he would not have cancelled the order for the thirty in. 7/32 laces, if he could have continued to place them with customers in Boston.

*"Examination of F. J. Fawcett.*

"Q. If you had not gotten instructions from your customers, you would not have cancelled the contract, would you?

"A. I would not have cancelled the contract if they had not cancelled it with me.

"Q. That is what I understand. Then you kept receiving shipments, and kept the contracts alive, until that date, for those reasons, that is right, is it not?

"A. Yes, sir."

The court instructed the jury fully and accurately as to the rights of the plaintiff under the original contracts, unmodified and unaffected by the course of dealing between the parties, but these instructions wholly ignored the evidence tending to show a waiver of his rights by the voluntary action of the plaintiff.

An instruction should have been given defining waiver, how effected, and its consequences, and instructing the jury as to their duty, should they determine from the evidence that a waiver had actually taken place. Instruction number four, in the record, tendered by the defendant and rejected, would be a proper instruction if accompanied with a preceding paragraph defining waiver and how the same may be effected. And further, it would be better to add to instructions one to four, for the plaintiff, the words "unless the jury shall further believe from the evidence that the plaintiff waived his rights as set out in the instructions for the defendant," or words to that effect.

[15] With respect to the alleged contract not to sue, conceding that the correct version of same is found in the testimony of Lyons, it is not considered that this contract is an enforceable undertaking, but all that passed in that connection between Lyons and Fawcett is proper matter for the

consideration of the jury in the determination of the inquiry of waiver.

For the reasons stated, we are of opinion to set aside the verdict and judgment under review, and award a new trial, to be proceeded with not in conflict with the views expressed in this opinion.

*Reversed.*